Craig PITTMAN, et al., Plaintiffs,

v.

Randall L. COLE, et al., Defendants.

No. Civ.A. 00–0865–CB–L.

United States District Court,
S.D. Alabama,
Southern Division.

Oct. 17, 2000.

Joseph M. Druhan, Jr., Mobile, AL, James Bopp, Jr., Terra Haute, IN, for plaintiffs.

Robert E. Lusk, Jr., J. Anthony McLain, Montgomery, AL, A. Danner Frazer, Jr., Mobile, AL, for defendants.

## ORDER

BUTLER, Chief Judge.

This case is before this Court upon Plaintiffs' motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure to prevent Defendants, Alabama Judicial Inquiry Commission ("JIC") and Alabama State Bar–Office of General Counsel ("ASB"), from enforcing allegedly unconstitutional "enforcement policies" contained in their respective Advisory Opinions in violation of the First Amendment of the United States Constitution ("U.S. Const.").[1] Specifically, this matter comes before this Court on Plaintiffs' Verified Complaint (Doc. 1) and Mo-

---

1. For simplicity, this Court will refer collectively to the respective Defendants who are individual members of the Alabama State Bar ("ASB") and/or Alabama Judicial Inquiry Commission ("JIC") entities, as ASB Defendants or JIC Defendants. However, this Court is aware and takes special note that neither the JIC nor ASB, as the entity itself, are a party to this action. Moreover, this Court adds that as the individual members of these bodies are sued as individual defendants in their official capacities, the Eleventh Amendment presents no bar to Plaintiffs' claims for actions seeking declaratory and injunctive relief against state officials for alleged violations of federal law; however, the Eleventh Amendment does preclude plaintiffs from obtaining monetary damages from individual defendants in their official capacities. *See Beasley v. Alabama State Univ.*, 3 F.Supp.2d 1304, 1307 (M.D.Ala.1998). In determining whether suits against state officials are in truth suits against the state and thus outside of federal courts' jurisdiction, the U.S. Supreme Court has distinguished between cases in which monetary damages as opposed to injunctive relief is sought. *See Cate v. Oldham*, 707 F.2d 1176 (11th Cir.1983), *cert. question answered*, 450 So.2d 224 (1984) (noting that generally there is no violation of the Eleventh Amendment when injunctive relief is sought as the only remedy and the state itself is not a named party).

tion For A Preliminary Injunction (Doc. 3) in addition to Plaintiffs' Motion To Consolidate Hearing On Plaintiffs' Motion For Preliminary Injunction With Trial On The Merits Of Plaintiffs' Verified Complaint (Doc. 5); Defendants' Motion To Dismiss (Doc. 13)[2] and Objection To Plaintiffs' Motion To Consolidate (Doc. 16);[3] and, Defendants' Objection To Consolidation (Doc. 19)[4] and Motion To Dismiss.[5] (Doc. 20).[6]

This Court, cognizant of the importance of this matter and after careful consideration of all the issues, finds and it is hereby **ORDERED** that the Defendants' Motions to Dismiss are now **MOOT** as Plaintiffs' Motion For A Preliminary Injunction is due to be **GRANTED** for the foregoing reasons as follows.

## I. BACKGROUND

### A. *Procedural History*

On September 26, 2000, Plaintiffs filed a complaint and preliminary injunction mo-

tion as well as a motion to consolidate. (Docs. 1, 2, and 5). The JIC and ASB Defendants objected, filing their respective motions to dismiss, oppositions to the preliminary injunction, and objections to consolidation. (Docs. 13, 15, 16, 18–20). On October 10, 2000, this Court held a hearing on the Plaintiffs' requested preliminary injunction and at that time, granted the oral motion made in open court by the Defendants to dismiss Defendants O'Rear, Boyd, Donaldson, and Lazenby, individual members of the Alabama State Bar, from this action (Doc. 32).[7]

### B. *Factual History*

This action arises out of the Plaintiffs' 2000 candidacy for various judicial seats on the Alabama Court of Civil Appeals and the Alabama Court of Criminal Appeals, as well as from the Christian Coalition of Alabama's ("CCA") desire to publish voter guides regarding judges and judicial candidates.[8] Plaintiffs filed this action under

---

**2.** As to only Defendants J. Anthony McLain, Caine O'Rear, III, David R. Boyd, W. Scott Donaldson, and Blake R. Lazenby (ASB Defendants).

**3.** *Id.*

**4.** As to only Defendants Hon. Randall L. Cole, Hon P. Ben McLauchlin, Jr., Hon. James M. White, Norman E. Waldrop, Jr., J. Mark White, Lee E. Portis, David Scott, and Greg Sullivan (JIC Defendants).

**5.** *Id.*

**6.** Plaintiffs' Motion for a Temporary Restraining Order ("TRO") (Doc. 2) was previously **DENIED** by this Court on September 27, 2000, because the Plaintiffs failed to show any immediate or irreparable injury that would result *before* the parties could be heard in opposition and that the Plaintiffs' counsel failed to certify to the court in writing efforts made to give notice to the adverse parties or the reasons supporting a claim that notice should not be given. (Doc. 6). This Order will not address any aspects of either party's argument which pertain to the prior TRO request.

Moreover, as to Plaintiffs' Motion To Consolidate Hearing On Plaintiffs' Motion For Preliminary Injunction With Trial On The Merits Of Plaintiffs' Verified Complaint (Doc. 5), Defendants' Objection To Plaintiffs' Motion To Consolidate Hearing On Plaintiffs'

Motion For Preliminary Injunction With Trial On The Merits Of Plaintiffs' Verified Complaint (Doc. 16) and Defendants' Objection To Consolidation Of Preliminary Injunction Hearing And Trial On The Merits (Doc. 19), based on the arguments presented at the preliminary injunction hearing, this Court finds and it is hereby **ORDERED** that Plaintiff's Motion To Consolidate is due to be **DENIED** and as such, this Order will not address or encompass either party's arguments as to consolidation. This Court finds that it is in the interests of justice to preserve the judicial process and avoid a premature adjudication on the merits.

**7.** Thus, the only remaining ASB Defendant is J. Anthony McLain, ASB Office of General Counsel.

**8.** The original CCA survey questionnaire, which all Plaintiffs received, initially included thirty (30) questions and it is upon those thirty (30) questions, which the JIC and ASB rendered their Advisory Opinions. *However, now, the CCA has stipulated that it has withdrawn fifteen (15) of the original questions, stating that it will neither publish nor request responses to those withdrawn questions.* The CCA has determined that they only wish to obtain responses to, and publish, the following questions [4, 5, 13, 16–24, 26, 29 and 30] in voter guides before the November 7, 2000

the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the First and Fourteenth Amendments, contending that the Defendants violated their rights of free speech, as findings included in two Advisory Opinions issued by the Defendants allegedly establish an unconstitutional "as-applied" interpretation of the Alabama Canons of Judicial Ethics ("Canons") resulting in an "enforcement policy" [9] which allegedly precludes judges and judicial candidates from responding to, and the CCA from receiving and publishing responses to, the original CCA thirty (30) question survey questionnaire.

The Plaintiffs include: Craig Pittman, Greg Shaw, and Alice Martin, Alabama residents and candidates for statewide judicial offices in Alabama's upcoming November 7, 2000, election; [10] the CCA, a non-profit, non-partisan, education and lobbying organization that publishes voter guides to educate its members and other

election, to which a judge or judicial candidate is to respond "Agree," "Disagree," "Undecided," or "Decline." This Court's Order granting the preliminary injunction only applies to the remaining fifteen (15) questions noted herein.

Thus, only the following fifteen (15) questions are the potential subject of CCA publication. These questions ask: (4) "Secondary school-based clinics should dispense birth control devices without requiring prior parental notification and consent[;]" (5) "The faith or religious beliefs of a judge should play no role whatsoever in her or his judicial decisions[;]" (13) "Leaving aside entirely the relevant U.S. Supreme Court and/or Alabama Supreme Court precedent about legal status of an unborn child, I as an individual believe that an unborn child is a fellow human being, imbued with a soul by its Creator[;]" (16) "Setting aside my obvious and acknowledged duty to strictly construe and enforce the acts of the legislature, I am personally opposed for moral and religious reasons to the establishment of gambling in this state for any reason[;]" (17) "The ABA House of Delegates has passed various policy resolutions supporting strong federal gun control measures, to include federal licensing requirements for gun purchasers, increased federal taxes, periodic reviews of the eligibility of handgun owners, and waiting periods for the purchase of firearms. As a general matter, I support the ABA's position on handgun control[;]" (18) "The state should require the registration of firearms and the licensing requirements of firearms owners[;]" (19) "The ABA House of Delegates passed a policy resolution in February 1999, supporting the enactment of legislation and public policy providing that adoption shall not be denied on the basis of sexual orientation if in the best interest of the child. I support the ABA's position on this issue[;]" (20) "Marital benefits provided by employers should be extended to domestic partners regardless of marital status or sexual orientation[;]" (21) "I support adoption of a federal constitutional amendment permitting officially sanctioned non-coercive student led prayer in public schools and at public school sporting events[;]" (22) "Several years ago, the ABA House of Delegates passed a policy resolution urging reauthorization of the National Endowment of the Arts (NEA) with no restrictions on the content, subject matter, message or idea of what the endowment may fund. I do not support the ABA's position on reauthorization of the NEA[;]" (23) "Desecration of the American flag has been determined to be protected political speech under the First Amendment. In order to protect the American flag from desecration I would support adoption of a federal constitutional amendment to that effect[;]" (24) "Some proof of identification should be required in order to vote[;]" (26) "As a judge, I would have no philosophical objections to reducing a verdict, which is excessive under the applicable law[;]" (29) "Alabama's reputation for 'lawsuit abuse' and 'Tort Hell,' as described several years ago in some national publications, has harmed economic development efforts and job creation[;]" and, (30) "According to the August 2000 issue of the ABA Journal, 33 states have set caps or limitations on the amount of money that juries can award. Placing limitations on jury awards puts the future of the jury system in serious jeopardy."

9. At this time, this Court does not make a determination as to whether the Advisory Opinions constitute an "enforcement policy," as alleged; instead, this Court only assesses the opinions in light of their impact on the Plaintiffs' ability to engage in free speech under the more narrow standards for standing and to grant a preliminary injunction. *See infra* III. B–C.

10. Craig Pittman is an attorney campaigning to be elected to Place 1 on the Court of Civil Appeals. (Compl.¶ 6). Greg Shaw is an attorney campaigning to be elected to Place 1 on the Court of Criminal Appeals. *Id.* Alice Martin is an attorney campaigning to be elected to the Court of Criminal Appeals. *Id.*

citizens about candidates for public office;[11] and, Judge John Crawley,[12] Alabama resident and judge on the Court of Civil Appeals, who is currently campaigning for re-election and is presently a member of the JIC.

The Defendants include: Randall L. Cole, Norman E. Waldrop, Jr., James M. White, P. Ben McLauchlin, Lee E. Portis, David Scott, Greg Sullivan, and Mark White, sued in their official capacity as individual members of the Alabama JIC, which was created by ALABAMA CONSTITUTIONAL AMENDMENT NO. 581 § 6.17 and pursuant to § 6.17(b) has the "authority to conduct investigations and receive or initiate complaints concerning any judge of a court of the judicial system of .... [Alabama];" and, J. Anthony McLain, sued in his official capacity as ASB General Counsel, who may initiate proceedings regarding disciplinary procedures administered by the Alabama Disciplinary Commission pursuant to ALABAMA RULES OF DISCIPLINARY PROCEDURE, RULE 1(a)(1) and 3.[13]

## II. DISCUSSION

"The law is not a series of calculating machines where definitions and answers come tumbling out when the right levers are pushed."[14]

### A. *Background*

#### 1. *Arguments*

Plaintiffs allege that this action for declarative and injunctive relief arises under the FIRST and FOURTEENTH AMENDMENTS as the case concerns the constitutionality of "enforcement policies" contained in the JIC and ASB Advisory Opinions which allegedly accomplish an unconstitutional "as-applied" interpretation of the CANONS in violation of the FIRST AMENDMENT, because the "policies" infringe upon the CCA's and judicial candidates' rights to free and protected speech. (Compl.¶¶ 1–2). Specifically, the Plaintiffs contend that the JIC and ASB's "enforcement policy" chills judicial candidates' free speech by interpreting CANONS 2A, 3A(1), 3A(6), 7B(1)(a), and 7(B)(c), to prohibit candidates from expressing their views on legal and political issues and from responding to the CCA questionnaire that seeks to ascertain the candidates' views on certain is-

---

11. The CCA intends to publish voter guides on the candidates before the November 7, 2000, election day, which would contain answers to certain questions posed to judges and judicial candidates from survey questionnaires mailed to each incumbent and candidate for judicial office on August 30, 2000. (Compl.¶ 10).

12. Judge Crawley's Motion For Permissive Intervention seeks relief from the JIC enforcement policy as contained in Adv.Op. 00–763, issued Sept. 8, 2000. (Doc. 11 at 2). He alleges that the JIC's "enforcement policy" is unconstitutional in that it infringes upon his protected speech rights under the FIRST AMENDMENT: the JIC's "enforcement policy" hinders judicial candidates' free speech by interpreting CANONS 2A, 3A(1), 3A(6), 7B(1)(a) and 7B(1)(c), as prohibiting candidates from expressing their views on legal and political issues and specifically, from responding to the CCA questionnaire that seeks to ascertain candidates' views on particular issues. *Id.* Moreover, Judge Crawley notes that the CCA questions at issue relate to the candidates' personal and judicial philosophy (questions 5,

13, and 30), as well as their views on social issues commonly mentioned in public and political debates (questions 4, 16–24, 26, and 29). *Id.* Judge Crawley answered the CCA questionnaire and returned his answers to the CCA office as requested, and presently argues that he fears disciplinary action, as the JIC "failed to delineate the particular Canons each question violated[,]" finding only that judicial candidates should not respond to any of the questions in CCA's questionnaire "other than by checking the opinion indicating that the candidate declines to respond to the questions posed." *Id.*

13. The ALABAMA RULES OF PROFESSIONAL CONDUCT also provide disciplinary procedures for attorney candidates for judicial office, who fail "to comply with the Alabama Canons of Judicial Ethics." *See* ALA.RULES PROF. CONDUCT, RULE 8.2.

14. *See* William O. Douglas, *The Dissent: A Safeguard of Democracy*, 32 J.AM.JUD. DOC. 104, 105 (1948).

sues. *Id.* ¶ 2. Plaintiffs also argue that the "enforcement policy" prohibits the CCA from receiving the judicial candidates' responses, which in turn prohibits the CCA and its members from receiving and publishing such political speech. *Id.*

In contrast, the JIC Defendants argue that the CCA questionnaire [15] is intended "to give its members and the public an idea of how a judge might rule on certain hot button issues[,]" as "[i]f it does not accomplish that purpose, then it has no value." [16] (Doc. 18 at 5). The JIC Defendants argue that it is apparent the CCA wants to know in advance how judges will rule on certain issues, but "the Canons require that judges maintain not only independence of thought with respect to all issues, but also the apparent independence of thought." *Id.* The JIC Defendants note:

> [v]irtually ever case cited by Plaintiffs in their injunction memorandum recognizes the compelling state interest in ensuring the independence of the judiciary as well as the appearance of independence. The cases recognize a competing interest in a candidate's right to express his views, and the cases reflect tension and disagreement as to how those competing interests must be balanced.

*Id.*

Further, the ASB Defendants argue that the CCA questionnaire calls for a " 'promise of conduct in office' or an announcement of the candidate's conclusions of law on issues that the candidate would be called upon to decide as a judge." (Doc. 15 at 11). The ASB Defendants note that "[i]t is only those questions ... that the Alabama Rules of Professional Conduct would prohibit the candidate from answering[,]" and that "[n]othing in the opinion prohibits judicial candidates or even suggests that the candidates should not respond to the questionnaire." *Id.* The ASB Defendants contend the opinion "merely advises that most of the questions call for responses that are prohibited under the Canons ... and, consequently, the Rules...." *Id.* The ASB Defendants add that "[o]bviously, the CCA understood that the questions could be considered improper for judicial candidates," because the questionnaire provides a 'decline' option if the candidate believes to respond would be violative of the CANONS. *Id.* As such, the ASB argues that the Plaintiffs' claim that the informal Advisory Opinion "chills" the ability to answer to, as well as receive and publish, questionnaires in the CCA voter guide, "is based on a mischaracterization of the facts." *Id.*

### 2. *Relevant ALABAMA CANONS OF JUDICIAL ETHICS ("CANONS")*[17]

Pursuant to the ALABAMA CONSTITUTION of 1901, as amended, the JIC and the Court of the Judiciary were established to

---

**15.** The JIC Defendants add that the form of the questionnaire is troubling as "[j]udicial candidates should not be pressed into committing themselves to a one-word answer to questions of this nature[,]" because "[t]he question as asked offends the Canons...." (Doc. 18 at 5).

**16.** The JIC Defendants note that "[w]ithin the last 10 years, judicial campaigns in Alabama have deteriorated, with Plaintiffs lawyers and business interests generally accusing one another of electing representative judges, rather than independent judges[,]" and "[t]his development undermines the credibility and public confidence in the judiciary." (Doc. 18 at 5).

**17.** The CANONS ensure that only those persons with the highest ethical standards be maintained as judges within the judiciary, and the State of Alabama provides for the regulation of judicial ethics by certain rules and procedures. To this end, the Supreme Court of Alabama promulgated the CANONS and RULES OF PROFESSIONAL PROCEDURE which together, govern the conduct of judges. Notably, CANON 7C proclaims that "[i]f such filing is permitted by law, a complaint alleging a violation of this Canon 7 shall be filed with the Judicial Inquiry Commission." CANON 7C(2) provides that a complaint for a CANON 7 violation "... filed with the [JIC] ... or the [ASB] ... during the course of a campaign for election shall be given priority by that institution, and every effort shall be made to render a decision on the complaint during the course of the election campaign." *See* CANON 7C(2) (Amended effective October 1, 1990; January 1, 1998; July 1, 1998).

enforce the CANONS,[18] which govern the character and conduct of judges and judicial candidates in the State of Alabama and have the force and effect of law. *See* ALA. CONST. OF 1901, AMEND. 581, §§ 6.17 and 6.18. The Supreme Court of Alabama adopted the CANONS in 1976, as a code for judges and judicial candidates, and a declaration of that which the people of Alabama have a right to expect of them. *See* CANONS PREAMBLE (effective February 1, 1976). Additionally, pursuant to the ALA. CONST. AMEND. 581, "[t]he Supreme Court shall adopt rules governing the procedures of the [JIC] commission." [19] *See* ALA. CONST. AMEND. No. 581 § 6.17(c).

The Alabama code of legal ethics, as cast in the CANONS, declares [20] the following. CANON 2A, entitled, "A Judge Should Avoid Impropriety And The Appearance Of Impropriety In All His Activities," expounds that "[a] judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Additionally, the accompanying commentary provides that "[p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct by judges[,]" so that:

[a] judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must ... accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

*See* CANON 2A (Commentary).

Moreover, CANON 3, entitled, "A Judge Should Perform The Duties Of His Office Impartially And Diligently," states that:

[t]he judicial activities of a judge take precedence over his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply: ... [A(1) ] A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism.

*See* CANON 3A(1).

As such, the judge has "[t]he duty to hear all proceedings fairly and with patience" as "[c]ourts can be efficient and businesslike while being patient and delib-

---

18. CANONS OF JUDICIAL ETHICS, Effective February 1, 1976, Including Amendments Received Through May 1, 2000.

19. The *JIC operates similar to a grand jury in that it is convened permanently as an independent* agency, with authority to conduct investigations and receive or initiate complaints concerning any judge of a court of the judicial system of Alabama. *See* ALA. CONST OF 1901, AMEND. 581, § 6.17(b). The JIC has jurisdiction over all state judges but it "cannot impose discipline on judges" so that in the event that a majority of the members of the JIC decide a "reasonable basis" exists to charge a judge with violations of any CANONS, the JIC shall file a complaint with the Court of the Judiciary. (Doc. 18 at 1–2). The Court of the Judiciary, then, in turn, meets to hear complaints filed by the JIC. *Id.* § 6.18(a). Pursuant to ALA. CONST.AMEND. 581 § 6.18(a):

[t]he court shall be convened to hear complaints filed by the Judicial Inquiry Commission. The court shall have authority, after notice and public hearing (1) to remove from office, suspend without pay, or

censure a judge, or apply such other sanction as may [sic] prescribed by law, for violation of a Canon of Judicial Ethics, misconduct in office, failure to perform his or her *duties, or (2) to suspend with or without* pay, or to retire a judge who is physically or mentally unable to perform his or her duties.

Moreover, "[a] judge aggrieved by a decision of the Court ... may appeal to the Supreme Court. The Supreme Court shall review the record of the proceedings on the law and the facts." *See* ALA CONST. AMEND. 581 § 6.18(b). Additionally, "[t]he Supreme Court shall adopt rules governing the procedures of the Court...." *Id.* § 6.18(c). However, the JIC Advisory Opinions may be considered by any court, "but are not biding on the Court of the Judiciary, or on any other court" and Court of Judiciary decisions may be appealed to the Alabama Supreme Court. (Doc. 18 at 1–2).

20. This Court's analysis of the CANONS is limited to those provisions which were evaluated by the JIC and ASB and which are referenced as the subject of contention in this case.

erate." *See* CANON 3 (Commentary). CANON 3A(6) also articulates that:

A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to his direction and control. This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.

Further, CANON 7B, entitled, "A Judge Or A Judicial Candidate Shall Refrain From Political Activity Inappropriate To Judicial Office," provides that under 7B(1)(a) as relates to campaign conduct:

[a] candidate for judicial office ... (a) [s]hall maintain the dignity appropriate to judicial office[,] ... [and] (c) [s]hall not make any promise of conduct in office other than the faithful and impartial performance of the duties of the office; shall not announce in advance the candidate's conclusions of law on pending litigation; and shall not misrepresent his or her identity, qualification, present position, or other fact.

*See* CANON 7B(1)(c).

### 3. *Relevant Advisory Opinions*

Specifically, with the aforementioned CANONS in mind, this Court may now turn to the literal text of the JIC and ASB Advisory Opinions,[21] which interpret various provisions of the CANONS to the original CCA 30 questions survey questionnaire, finding allegedly unconstitutional "as-applied" assessments.[22] The JIC first addressed the issue of questionnaires issued to judicial candidates in Advisory Opinion 94–537, on December 1, 1994. The JIC, by unanimous decision, determined that questionnaires submitted to a candidate for judicial office during a political election campaign can be problematic, as "[t]he general sense of these [ethics advisory] opinions is that anything that could be interpreted as a pledge that the candidate will take a particular approach in deciding cases or a particular class of cases is prohibited." (JIC Ad.Op. 94–537 at 1). The JIC continued, stating that:

[m]ost advisory opinions addressing the use of questionnaires in judicial campaigns strongly disapprove of the practice .... judicial candidates have been advised to refuse to respond to questionnaires from political organizations concerning gun control, abortion, the Equal Rights Amendment, regulation of condominiums, and the right to work.

*Id.*

The JIC also noted that usually, judicial candidates "may neither initiate discussion

---

**21.** JIC RULE 17 provides the JIC may issue advisory opinions as to "whether certain specified action contemplated or proposed to be taken by [a judge] may constitute a violation of the Canons...." *See Ex Parte Balogun,* 516 So.2d 606, 609 (Ala.1987), *abrogated by* (recusal of judges motions on appeal only) *Ex Parte Crawford,* 686 So.2d 196 (Ala.1996), *on remand to* 686 So.2d 199 (Ala.Crim.App. 1996). The JIC opinions are rendered for the benefit of a judge and are admissible on behalf of a judge, should he act consistent with the opinion and then have a disciplinary proceeding brought against him for that conduct. *Id.* Additionally, "[s]imilar to an advisory opinion by this [Alabama Supreme] Court pursuant to § 12–2–10, Code of Alabama (1975)," the JIC's "advisory opinions are not binding and do not affect a party's rights or remedies." *Id.* (citing *Alabama Educ. Ass'n v. James,* 373 So.2d 1076 (Ala.1979); and, *Opinion of the Justices,* 280 Ala. 692, 198 So.2d

269 (1967)). Indeed, "[w]hile this [Alabama Supreme] Court will consider the opinion of the [JIC] ... we are not bound by it." *Id.*

**22.** On September 8, 2000, the JIC issued Advisory Opinion 00–763, regarding "Answering Questionnaire To Be Used In Preparation Of Organization's Voter Guide," finding that judicial candidates should decline to respond to any of the questions set forth in the CCA questionnaire. (Compl.¶ 12). On September 11, 2000, the ASB Office of General Counsel issued an informal Advisory Opinion stating that responses to the survey questionnaire would constitute a direct violation of CANON 7B(1)(c) and the RULES OF PROFESSIONAL CONDUCT, RULE 8.2, and thus prohibited responding to the questions. *Id.* ¶ 14. The "enforcement policies" alleged are the aforementioned interpretations of the CANONS, "as-applied," to the CCA questionnaire.

of specific recent cases nor respond to questions concerning such cases." *Id.*

Moreover, on September 8, 2000, the JIC issued Advisory Opinion 00–763, as to whether judicial candidates could respond to this particular CCA 30 questions survey questionnaire at issue here, which was to be used in preparation of the CCA's voter guide. The JIC determined that judicial candidates could not respond, "except to decline to answer the inquiries presented." (JIC Adv.Op. 00–763 at 1). The JIC characterized the CCA questionnaire, as inquiring:

> about whether the candidate's views are consistent with various United States Supreme Court rulings, and how the candidate would apply those rulings; whether the candidate would uphold as constitutional certain hypothetical statutory provisions; what the candidate's interpretation is of certain provisions of the United States and state constitutions; and that the candidate's views are on such political topics as legalized gambling, gun control, sexual orientation, prayer in public school, the National Endowment of the Arts, voter identification, tort reform, abortion, and class action lawsuits.

*Id.*

The JIC noted that it previously addressed the subject of questionnaires in 1994 and at that time, "concluded that judicial candidates should not respond to questions concerning issues that are likely to come before them in their judicial capacity." *Id.* The JIC also stated then, that "an expression of intent to disregard precedent would be unethical." *Id.*

In addressing the recent inquiry as to the specific CCA questionnaire, the JIC reviewed CANONS 7B(1)(a) and (c), 2A, 3A(1) and (6). *Id.* at 1–2. The JIC found that:

> [t]he inquires under consideration in the questionnaire at issue call for or appear to solicit the judicial candidate's predisposition toward specific legal views on matters pending or impending before any number of trial and appellate courts.

Some of the questions call for the candidate to comment on issues that are likely to come before the candidate if elected judge. A judge's response to such questions would clearly violate Canon 3A(6) . . . .

*Id.* at 2 (citing *In Re Matter of Sheffield,* 465 So.2d 350, 355 (Ala.1984), *reh'g denied* (1985); and, *Riddle v. State,* 669 So.2d 1014, 1020 (Ala.Crim.App.1994), *reh'g denied, cert. denied,* 661 So.2d 274 (1994)).

The JIC found that "[m]any of the inquires under consideration tend to indicate that the candidate, if elected, would be predisposed to ruling in a certain manner on the subject issues[,]" and responses to such inquiries would be "proscribed" by CANON 7B(1)(c) "against judicial candidates making any promise of conduct in office other than the faithful and impartial performance of the duties of the office and announcing their conclusions of law on pending litigation." (JIC Ad.Op. 00–763 at 2). The JIC also stated that such responses would "impair a judge's obligations under CANON 2A, thereby jeopardizing public confidence in the law and in the integrity and impartiality of the judiciary[,]" as "[i]t is not appropriate for a judicial candidate to answer questions which are intended to, or will have the effect of, committing the candidate to a course of action with respect to issues likely to come before the court." *Id.*

Additionally, the JIC noted that for the inquiries which involve U.S. Supreme Court rulings, "it has previously concluded that a judicial candidate may not express an intent to disregard precedent[,]" so that a judicial candidate "should not give the impression to anyone that the candidate would disregard controlling judicial authority as this would encourage disrespect for the law and/or the judicial office." *Id.* The JIC also found that other questions in the survey "appear to solicit answers that would tend to embroil the judicial candidate in political debate that is inappropriate to the dignity of the judicial office[,]" and for a candidate to respond to these questions "gives the appearance of a lack of impartiality or of pandering to certain

interests, and places the judge in the role of a political advocate." (JIC Ad.Op. 00–763 at 2). Thus, the JIC concluded that "[a] judge must avoid any statements which could be interpreted as a pledge of judicial conduct or which appeal to prejudices or special interests[,]" as "[a]n impartial judiciary is indispensable to our system of justice."[23] *Id.*

Further, the ASB Office of General Counsel issued an informal Advisory Opinion on September 11, 2000. In the Advisory Opinion, the ASB noted that it was an opinion in response to the inquiry of whether a judicial candidate "may ethically respond to this [CCA] questionnaire," so that in responding, it was providing an informal opinion of the OGC and "is not binding on the Disciplinary Commission of the Alabama State Bar." (ASB Ad.Op. at 1). The ASB found the CCA questionnaire inappropriate, citing RULE 8.2(b) of the RULES OF PROFESSIONAL CONDUCT of the ASB, which provides that "[a] lawyer who is a candidate for judicial office shall com-

ply with the applicable provision of the Alabama Canons ... and failure to so comply ... shall constitute a violation of this disciplinary rule." *Id.* The ASB Advisory Opinion cited CANON 7B(1)(c) in support of its finding that:

> [a] review of the [CCA] ... questionnaire conclusively establishes that most, if not all, of the questions presented request you to make a promise of conduct in office or to announce in advance your conclusions of law on issues you would be called upon to decide as a judge .... any response to such questions would constitute a direct violation ... [of CANON 7B(1)(c) so that] you are ethically prohibited by RULE 8.2(b) ... from responding to such questions.

(ASB Ad.Op. at 2).[24]

## B. *SUBJECT MATTER JURISDICTION*

*Do The Plaintiffs Have Standing So That This Case Presents A Ripe*[25] *And Justiciable Case Or Controver-*

---

23. The JIC also noted that the form of the CCA questionnaire is "troublesome in that it requires simplistic responses to difficult and complex matters[,]" which "can rarely be appropriately addressed with a one word response." (JIC Ad.Op. 00–763 at 2) (noting that some questions may not be able to be ethically answered at all while others may need a thoughtfully drafted explanation or elaboration). Thus, "[a]ny response ... must be carefully and meticulously tailored to be consistent with the spirit and intent of the Canons...." *Id.* at 3. Thus, the JIC finds the CANONS "do not permit a judicial candidate to respond to the subject [CCA] questionnaire, other than by checking the option indicating that the candidate declines to respond to the questions posed." *Id.*

24. Although not argued by Counsel, this Court finds it interesting that the ASB's Advisory Opinion appears to be somewhat less restrictive than that of the JIC, as the ASB findings do not state that *all* of the CCA questions are violative of the CANONS; instead, *only that "most, if not all"* of the questions appear to be.

25. For a case or controversy to be ripe for judicial review, it must involve "an administrative decision [that] has been formalized and its effects felt in a concrete way by the

challenged parties[,]" and two questions must be asked: 1) are the issues fit for judicial review; and, 2) will hardship fall to the parties upon withholding court consideration of the issues? *See Charter Fed. Sav. Bank v. Office of Thrift Supervision,* 976 F.2d 203, 208 (4th Cir.1992), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993). The Fourth Circuit has noted that "[a] case is fit for judicial decision where the issues to be considered are purely legal ones and where the agency rule or action giving rise to the controversy is final and not dependant upon future uncertainties or intervening agency rulings." *See Kemler v. Poston,* 108 F.Supp.2d 529, 540 (E.D.Va.2000); and, *Charter Fed.,* 976 F.2d at 208. A claim is thus unripe when "critical elements are contingent or unknown." *See Marusic Liquors, Inc. v. Daley,* 55 F.3d 258, 262 (7th Cir.1995).

Here, the JIC and ASB Advisory Opinions constitute administrative decisions of the State of Alabama, which have been formalized, are final, and reflect upon the state's policy as they are not dependent upon any other determinations. Indeed, these opinions may be used by those facing charges to aid in defending disciplinary action rather than be dependent upon future findings. Moreover, here, "critical elements," such as the credible threat of potential disciplinary action or state

sy?[26]

■ Prior to reaching the merits of this action, this Court must first determine whether the Plaintiffs have standing to bring a FIRST AMENDMENT challenge to the JIC and ASB Advisory Opinions interpreting the CANONS "as-applied," as "[w]e cannot proceed without determining that standing exists, even if both parties concede jurisdiction." *See Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759 (11th Cir. 1991); and, *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1328 (11th Cir.2000). Here, this Court finds that the Plaintiffs are currently equipped with sufficient tools with which to properly build a sound foundation for FIRST AMENDMENT standing.

### 1. *Federal Standard For Standing and Ripeness*

■ ARTICLE III of the U.S. CONSTITUTION limits the jurisdiction of the federal courts to cases and controversies of sufficient concreteness to evidence a ripeness for review. *See* U.S. CONST. ART. III § 2 CL. 1; *Hallandale*, 922 F.2d at 759. The ripeness doctrine involves consideration of both jurisdictional and prudential concerns. *See Johnson v. Sikes*, 730 F.2d 644, 648 (11th Cir.1984). Indeed, "[e]ven when the constitutional minimum has been met . . . prudential considerations may still counsel judicial restraint." *See Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 940 n. 12 (D.C.Cir.1986); *Digital Properties Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir.1997); and, *Johnson*, 730 F.2d at 648. The ripeness doctrine prevents and protects federal courts from engaging in speculation or wasting their resources through a review of only potential or abstract disputes, as "[t]he doctrine seeks to avoid entangling courts in the hazards of premature adjudication." *See Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 535 (3d Cir.1988); and, *Digital*, 121 F.3d at 589.

■ To determine ripeness or the justiciable nature of a claim, the federal court must assess the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *See Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir.1995); and, *Coalition For Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1315 (11th Cir. 2000). As such, this Court must resolve "whether there is sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision making by the court." *See Cheffer*, 55 F.3d at 1524; and *Coalition For Abolition*, 219 F.3d at 1315. Thus, the determination of ripeness is a crucial assessment, as it "goes to whether the district court had subject matter jurisdiction to hear the case." *See Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n. 7 (11th Cir.1989), *reh'g denied*, 893 F.2d 346 (1989).

■ Notably, as originally explicated by the Supreme Court in *Valley Forge Christian College v. Americans United For Separation of Church & State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), and later enunciated by the Eleventh Circuit, the constitutional core of standing encompasses three elements. The Plaintiff invoking federal court authority must show that: 1) there is a suffering of some actual or threatened injury-in-fact as a result of the putatively illegal conduct of the Defendant; 2) the injury can fairly be traced to the Defendants' conduct; and, 3) a favorable decision is likely to redress that injury. *See Wilson v. State Bar of Georgia*, 132 F.3d 1422, 1427 (11th Cir. 1998).

---

findings as to the propriety of the CCA questionnaire, are not unknown, as effects can be felt by the Plaintiffs in that they have already had to engage in self-censorship and fear future disciplinary action if they act in contravention to these Advisory Opinions.

26. Justiciability implicates the standing of litigants to assert particular claims and the appropriate timing of judicial intervention in the dispute presented by the claim. *See Regional Rail Reorganization Act Cases*, 419 U.S. 102, 136–48, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

## 2. Application

The crux of Plaintiffs' contentions centers on the argument that as a result of the aforementioned Advisory Opinions: judicial candidates have refused to answer, or mail in, the CCA questionnaire "in spite of their expressed desire to do so[;]" candidates who did answer some or all of the questions and/or sent them to the CCA have since requested that the CCA not use the answers given; and, because the CCA wishes to receive and publish information on the candidates' views derived from answers to at least some of the questions on the survey, the actions of the JIC and ASB have prevented the candidates and the CCA from exercising their FIRST AMENDMENT rights to freedom of speech. (Compl.¶¶ 15–17). Specifically, the Plaintiffs assert[27] that the candidates' interest in providing, and the CCA's desire to receive and publish, information regarding the candidates' personal and judicial philosophy (as requested in questions 5, 13, and 30), as well as the candidates' views on social issues commonly mentioned in public and political debate (as set forth in questions 4, 16, 17–24, 26, and 29), has been violated.[28] *Id.* ¶ 17.

27. Plaintiffs allege three Counts against the Defendants. First, the Plaintiffs claim that the enforcement position expressed in the JIC Advisory Opinion 00–763 and ASB informal opinion of September 11, 2000, adopt an unconstitutional "enforcement policy" which prohibits protected political speech by judicial candidates. (Compl.¶ 23). In Count II, Plaintiffs argue that the JIC and ASB's "enforcement policy" unconstitutionally prohibits Plaintiff CCA from receiving protected political speech. *Id.* ¶ 31. Further, the Plaintiffs contend in Count III that the Defendants' "enforcement policy" violates the First Amendment by applying the policy to Plaintiffs' protected speech. *Id.* ¶ 36.

28. Plaintiffs add that while the CCA "believes that the other questions are proper questions for judicial candidates to answer, CCA has chosen not to publish the answers to those questions." *Id.* ¶ 18.

29. The JIC Defendants argue the Plaintiffs lack standing to challenge the constitutionality of the JIC's Advisory Opinion because the

In contrast, generally, both JIC and ASB Defendants argue: this Court should dismiss the action due to lack of jurisdiction as there is no justiciable controversy because the Plaintiffs lack standing;[29] the complaint fails to state a claim upon which relief can be granted; the Plaintiffs have not exhausted their possible remedies; abstention is proper under the *Railroad Commission v. Pullman Co.,* (*Pullman*), 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), abstention doctrine; and, the claims presented are without merit. (Docs. 13, 15 and 18–20). Specifically, the JIC Defendants argue that the issues raised in Plaintiffs' Complaint are not ripe for review so that this Court lacks subject matter jurisdiction.[30] (Doc. 18 at 12–13 (citing *Digital,* 121 F.3d at 589)). The JIC Defendants add that the JIC's "function of giving advisory opinions and its function of considering whether to file a charge against a judge for violating the Canons ... are two separate and distinct functions." *Id.* at 2–3. Moreover, the ASB Defendants argue the aforementioned grounds based on their assertion that this case is procedurally similar to *Digital,* in that Digital's "rush to the courthouse was

Plaintiffs have failed to show an injury in fact that is concrete and particularized and actual or imminent (not conjectural or hypothetical), which is fairly traceable to the challenged action of the defendant, and that is likely to be redressed by a favorable decision (instead of merely speculative). (Doc. 18 at 1) (citing *White's Place, Inc. v. Glover,* 222 F.3d 1327, 1329 (11th Cir.2000)). The JIC Defendants claim that "Plaintiffs have failed to demonstrate that each of these standing requirements are in fact satisfied." *Id.*

30. The JIC Defendants argue that "[h]ere, Plaintiffs are challenging the constitutionality of a non-binding advisory opinion, not the validity of the Canon which were interpreted in the advisory opinion and not the authority of the JIC to render the opinion[,]" and that "[b]ecause the opinion does not represent 'a rule or regulation of an administrative board which carries with it the power of law or authority for enforcement,' Plaintiffs have failed to present issues which are fit for judicial decision." *Id.* at 13 (citing *Underwood v. State,* 439 So.2d 125, 128 (Ala.1983)).

premature" as Digital had failed to exhaust its available remedies at law.[31] (Doc. 15 at 6). Additionally, the ASB Defendants argue that the informal Advisory Opinion[32] does not prohibit or warn against responding to the questionnaire, asserting that "[i]t is only those questions ... that the Alabama Rules ... would prohibit the candidate from answering[,]" as "[n]othing in the opinion prohibits judicial candidates or even suggests that the candidates should not respond to the questionnaire." *Id.* at 11. Thus, the ASB Defendants claim that "[t]he informal advisory opinion is merely a confirmation of that understanding." *Id.*

Here, although there is no specific evidence before this Court to date as to pending disciplinary actions by the ASB or JIC against the Plaintiffs, no charges have been filed, and the Defendants' pleadings with this Court suggest that the Advisory Opinions are not binding, this Court finds, in light of the following analysis and application of the U.S. Supreme Court's applicable lower standing threshold for FIRST AMENDMENT claims, the Plaintiffs' contentions of self-censorship coupled with the possibility of future disciplinary action if the Plaintiffs act in contravention to the Advisory Opinions, constitute sufficient viable grounds for FIRST AMENDMENT standing.[33]

### a. *Injury–In–Fact*

As noted by the U.S. Supreme Court in *Valley Forge*, 454 U.S. at 472, 102 S.Ct. 752, in a federal court's assessment of standing, the actual injury requirement is vital, as it "tends to assure that the legal questions presented to the court will be resolved, not in the ratified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." Here, because this action involves the FIRST AMENDMENT and time is of the essence due to the upcoming election, the query as to whether the CCA and judicial candidates possess standing hinges on this first element—the existence of an actual or threatened injury—and this inquiry is by necessity "case-specific." *See Wilson,* 132 F.3d at 1428.

 Indeed, even though the federal standard for standing is somewhat elevated, due to the special nature of this action—a claim for an alleged violation of an organization's and judicial candidates' free speech rights—this Court must heed and apply the fact that the Supreme Court has relaxed the traditional rules of standing for challenges in the area of the FIRST AMENDMENT, by 'no[t] requir[ing] that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' *See White's Place,* 222 F.3d at 1329 (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (emphasis added)). Notably, this Court takes exceptional recognition of the fact that *"[i]n the First Amendment realm, [P]laintiffs do not have to expose themselves to enforcement in order to challenge a law[,]"* as instead, *"an actual injury can exist when the*

---

**31.** The ASB Defendants add that the Eleventh Circuit noted that "[e]ven when the constitutional minimum has been met, however, prudential considerations may still counsel judicial restraint." (Doc. 15 at 6–7) (citing *Action Alliance,* 789 F.2d at 940 n. 12; and, *Johnson,* 730 F.2d at 648). As such, the ASB Defendants argue that like in *Digital,* here, the Plaintiffs "in their haste to preserve their perceived First Amendment rights, rushed prematurely to the courthouse and as a result failed to present a mature claim for review." *Id.* at 7. The ASB Defendants contend that the Plaintiffs failure "to diligently pursue their available state law remedies establish that no

mature case or controversy exists." *Id.* (citing *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); and, *Miller v. F.C.C.,* 66 F.3d 1140 (11th Cir.1995), *cert. denied,* 517 U.S. 1155, 116 S.Ct. 1543, 134 L.Ed.2d 647 (1996)).

**32.** ASB Defendants contend that the ASB informal Advisory Opinion and CANON 7(b)(1) are constitutional. (Doc. 15 at 10).

**33.** This Court does not at this time reach the questioned constitutionality of the Advisory Opinions themselves or the constitutionality of the CANONS, as that is not at issue.

plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." See Jacobs v. The Florida Bar, 50 F.3d 901, 904 (11th Cir.1995), reh'g and suggestion for reh'g en banc denied (1995); and, Wilson, 132 F.3d at 1428 (emphasis added). "In such an instance, which is what is alleged here, [one of] the injur[ies] is self-censorship." See Wilson, 132 F.3d at 1428 (citing ACLU v. The Florida Bar, 999 F.2d 1486, 1492 (11th Cir.1993)). Federal courts will not force a plaintiff to choose between intentionally violating a law just to gain access to judicial review, and foregoing what he or she believes to be constitutionally protected activity to avoid prosecution. See Leverett v. City of Pinellas Park, 775 F.2d 1536, 1538 (11th Cir.1985) (per curiam). However, this Court also notes that:

> if no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes. A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable.

See ACLU, 999 F.2d at 1492 and n. 13.

Accordingly, "the threat of prosecution ... must be genuine; speculative or imaginary threats will not confer standing[,]" as "even in a first amendment context the injury-to-the-plaintiff requirement cannot be ignored." See White's Place, 222 F.3d at 1329; and, Hallandale, 922 F.2d at 760

(emphasis added). It is this standard which guides this Court in finding that the Plaintiffs have standing to pursue this action, as the injury-to-the-Plaintiffs is manifested in the genuine and credible threat of prosecution in the form of potential future disciplinary action as well as through the Plaintiffs' self-censorship resulting from a fear of enforcement of the Defendants' Advisory Opinions' "enforcement policies."

Specifically, the "injury in fact" standing element—an invasion of a legally protected interests which is concrete and particularized, actual or imminent, and not conjectural or hypothetical—has been established by the Plaintiffs. See Kemler v. Poston, 108 F.Supp.2d 529, 534 (E.D.Va. 2000) (holding that plaintiffs lacked standing because the case was not ripe for adjudication). Plaintiffs have alleged an injury that is "distinct and palpable[,]" by clearly setting forth facts sufficient to satisfy the ARTICLE III requirements as "a federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."[34] Id. Although these same principles have been applied to foreclose the exercise of federal jurisdiction in the face of injury apprehended upon future contingencies, this Court finds that the credible threat of future prosecution is not so attenuated as to depend upon numerous or unascertainable contingencies to deprive the Plaintiffs of a finding of "injury-in-fact."[35] Even though, generally, only rarely will allega-

---

**34.** See e.g., O'Shea v. Littleton, 414 U.S. 488, 497, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), (holding that plaintiff's claim was moot because there was no standing because the Supreme Court considered plaintiff's claims "to have drifted 'into the area of speculation and conjecture' " so that there was no "cognizable injury-in-fact and hence no case or controversy upon which jurisdiction could stand."). See also International Society for Krishna Consciousness of Atlanta v. Eaves, 601 F.2d 809 (5th Cir.1979) (holding plaintiff's claims moot on similar grounds).

**35.** See e.g., Zwickler, 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) (holding that there was no standing where the pro-

spective future candidacy of a former Congressman was involved); and, Renne v. Geary, 501 U.S. 312, 321–22, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (holding the First Amendment claim asserted by voters and others challenging a California constitutional provision was non justiciable, after concluding the plaintiffs desire to support and oppose candidates, in public and in print, coupled with the voters desire to read such endorsements, was opposed by "no factual record of an actual or imminent application of [the challenged ... statute] sufficient to present the constitutional issues in 'clean-cut and concrete form.' "). The Supreme Court also noted in Renne, that the record did not disclose "evidence of a credible threat that [the statute] will be en-

tions of a possible future injury satisfy the standing requirements of ARTICLE III, certain circumstances, such as when standing requirements arise in the context of FIRST AMENDMENT claims due, allow for findings of an "injury-in-fact" as to future injuries due to the special nature of the amendment, the importance of the rights secured, and the unique jurisprudence interpreting it. *See Kemler*, 108 F.Supp.2d at 535. Thus, Court finds that although the injury here may indeed depend on future contingencies, although not making any determination as to the merits of this case, the restriction of free speech rights at the present time is sufficient to produce a chilling effect to the CCA and judicial candidates concerned so that the standing requirements, as appropriately relaxed in this FIRST AMENDMENT claim, are met.

Moreover, the U.S. Supreme Court has noted that "[w]ithin the context of the First Amendment, the Court has enunciated other concerns that justify a lessening of prudential limitations on standing[,]" so that "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." *See Secretary of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). Additionally, the U.S. Supreme Court has held that constitutional violations may occur from a deterrent or chilling effect of governmental regulations *which fall short of a direct prohibition* against the exercise of First Amendment rights, *but which still impinge upon those rights indirectly.*[36] *See Laird v. Tatum*, 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), *reh'g*

*denied*, 409 U.S. 901, 93 S.Ct. 94, 34 L.Ed.2d 165, *and leave to file for reh'g denied* by 479 U.S. 911, 107 S.Ct. 309, 93 L.Ed.2d 284 (1986) (emphasis added). Here, the Plaintiffs' rights are impinged upon directly through self-censorship and indirectly, through the credible threat of future prosecution.

However, this Court notes that the requirement for claims implicating the FIRST AMENDMENT have "in no way eroded the established principle that to entitle a private individual to invoke the judicial power to determine the validity of . . . [an] action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as a result of the action. . . ." *See Laird*, 408 U.S. at 13, 92 S.Ct. 2318. The U.S. Supreme Court has noted that if indirect interference with the FIRST AMENDMENT rights of an individual is alleged, the plaintiff must put forward proof of a "distinct and palpable" injury. *See Meese v. Keene*, 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). Here, although the Defendants suggest that the Advisory Opinions they rendered are not binding and that due to the change in the CCA questions (from thirty (30) to fifteen (15)) a different determination might be made as to the CCA's and the candidates' ability to respond to, and publish, the "new" questionnaire, this Court finds that at the present time and in light of the exigencies of the circumstances with an election date looming, the Advisory Opinions as presently cast impinge upon the rights of free speech enough that a direct injury of self censorship and fear of disciplinary action is sufficiently "distinct and palpable," so that an "injury-in-fact" has resulted to the Plaintiffs.[37] Finally, even

36. *See e.g., Baird v. State Bar of Arizona*, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971) (finding standing for an applicant to the State Bar who was denied admission for her refusal to answer a question about the organizations forced[,]" so that "[i]n short, the plaintiffs had 'failed to demonstrate a live dispute involving the actual or threatened application of [the statute] to bar speech.' " *Id.* at 320, 111 S.Ct. 2331.

to which she belonged). *But cf Laird*, 408 U.S. at 11, 92 S.Ct. 2318 (stating that "in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging.").

37. The Plaintiffs' asserted belief that they have had to forego the constitutionally pro-

the Defendants themselves recognize that "this [is] a pre-enforcement challenge based upon claimed First Amendment Rights and that the injury component of the case or controversy analysis is loosely applied."[38] (Doc. 15 at 7).

Specifically, this Court notes the following regarding the respective arguments. Regarding self-censorship and future disciplinary action as comprising the alleged "injury-in-fact," the Plaintiffs argue that "[t]hey are unable to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day[,]" because "[t]hey cannot tell the public their views on constitutional rights or social policies" which prohibits the candidates from exercising their freedom of speech. (Doc. 1 ¶ 19). The

Plaintiffs contend that the Defendants' "enforcement policies" have created the "injury-in-fact" required for standing, as the policies chill the CCA's and candidates' speech because it requires the Plaintiffs "to withhold essential information from the voters as they seek to educate themselves and participate fully in our democracy." *Id.* The Plaintiffs argue that they have no adequate remedy at law and that "[i]mmediate and irreparable injury, loss, and damage has occurred and will continue to occur as a result of the JIC's and ASB's enforcement policy chilling Plaintiffs' free speech rights." *Id.* ¶¶ 21–22.

In contrast, the JIC Defendants[39] argue that the Plaintiffs lack standing because there is not an "injury-in-fact," due to the special nature of the Advisory Opinion. The JIC Defendants state that "[h]ere,

---

tected speech they pose and will continue to have to do so in the future (in not responding to, or in not receiving and publishing, the CCA questionnaire) to avoid punishment as enforced via the JIC/ASB Advisory Opinion "enforcement policies," suggests an objectively reasonable chilling of Plaintiff's First Amendment rights. Additionally, Judge Crawley, who completed and sent in the CCA questionnaire at issue, argues, citing *Buckley v. Valeo*, 424 U.S. 1, 52–53, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), that "the JIC's enforcement policy chills the free speech rights of judicial candidates such as himself" as the JIC opinion renders him "unable to make his views known so that voters may intelligently evaluate the candidates' personal qualities and positions on vital public issues before choosing among them on election day." (Doc. 11 ¶ 15). Judge Crawley claims that as a result, he is prohibited from sharing his views on constitutional rights, social policies, or other legal and political issues of concern to voters because "[t]he ruling requires judges and judicial candidates to withhold essential information from voters seeking to educate themselves and participate fully in our democracy." *Id.* Judge Crawley asserts immediate and irreparable injury, loss and damage due to the JIC's enforcement policy "chilling" his free speech rights. *Id.* ¶ 16.

**38.** In addressing the elements, this Court reserves any assessment on the merits and only finds for these elements based on the standing/ripeness standard to establish jurisdiction. The extant self-censorship resulting in direct-

ing the Plaintiffs to refrain from responding in the form of, as well as refraining from receiving and publishing, speech, even though perhaps not intended, when coupled with a looming potential for disciplinary action in light of the findings of those in a position to provide oversight on the judiciary, manifest an injury to the Plaintiffs as it chills their free speech rights for purposes of finding that standing is present to bring this anticipatory challenge.

**39.** The JIC Defendants claim the JIC is often called upon for advice and has issued about two-hundred (200) advisory opinions in the past five years. (Doc. 18 at 3). The JIC Defendants argue, however, that:

> [t]he adoption of an advisory opinion by the Commission involves no adversary proceedings, and the Commission seldom has the benefit of briefs or argument by interested persons. Because an opinion is not the product of an adversary process, it is ... not binding upon the judge requesting the opinion and has no binding effect on the future actions of the Commission.

*Id.*
The JIC Defendants note that their opinions offer guidance about how the Canons will apply to particular fact situations and that "the primary function of an advisory opinion, as the Supreme Court describes, is to give the requesting judge who relies upon it a degree of protection in a disciplinary proceeding." *Id.*

Plaintiffs are challenging the constitutionality of a non-binding advisory opinion, not the validity of the Canon[s] which were interpreted in the advisory opinion and not the authority of the JIC to render the opinion[,]" and that "[b]ecause the opinion does not represent 'a rule or regulation of an administrative board which carries with it the power of law or authority for enforcement,' Plaintiffs have failed to present issues which are fit for judicial decision." (Doc. 18 at 13). The JIC Defendants add that the Plaintiffs want this Court to intervene and rule that judicial candidates may answer the CCA questionnaire in full, alleging the advisory opinion has "chilled" candidates from doing so. *Id.* The JIC Defendants note however, that "no great hardship results from the candidates' fail-

ure to answer these narrowly drafted questions because there are other means available for the CCOA and the public to obtain information about the candidates' views on political and legal issues[,]" and "[t]his advisory opinion applies to this specific questionnaire only." [40] *Id.*

Moreover, the ASB Defendants argue that this Court lacks jurisdiction in that it does not present a justiciable case or controversy involving the ASB.[41] (Doc. 15 at 4). The ASB Defendants rely upon ARTICLE III of the U.S. CONSTITUTION as it limits the jurisdiction of the federal court to cases and controversies of sufficient concreteness ripe for review. *Id.* (citing *Digital,* 121 F.3d at 586; and *Kemler,* 108 F.Supp.2d 529)).[42] The ASB Defendants argue the burden of establishing standing

**40.** In support of the Defendants' argument that the Plaintiffs have not suffered and will not suffer an "injury-in-fact," the JIC Defendants highlight the distinction in their powers between filing charges against a judge for violating the CANONS and that of issuing Advisory Opinions. The JIC Defendants claim that they receive between two-hundred and three-hundred (200–300) complaints against judges annually and that they consider all complaints "to determine if a reasonable basis exists to charge a judge with a violation of the Canons." (Doc. 18 at 3). However, the JIC "recognizes that the filing of a charge against a judge is a very serious matter and exercises restraint in doing so, as evidenced by the fact that in the 27–years history of the Commission, its has filed charges against judges only 30 times." *Id.* at 3–4. The JIC Defendants add that:

> [h]istorically, the judge against whom the Commission is contemplating the filing of a charge is given an opportunity to appear before the Commission and make his or her case ... the Commission does not file a charge for every alleged violation of the Canon.

*Id.* at 4.

**41.** The ASB Defendants, in support of this argument, cite the non-binding nature of the Opinion and contend that the Plaintiffs' reliance on the informal ASB Advisory Opinion is:

> not objectively reasonable because the opinion is non-binding, the opinion was not requested by or addressed to the named plaintiffs in this action, the informal advisory opinion was issued **after** the deadline for responding to the CCA's questionnaire, the Candidate Plaintiffs could have very easily

obtained a formal, binding opinion of the Disciplinary Commission that would have the force and effect of a bar rule under the provisions of Rule 18, A.R.C.P., and the Candidate Plaintiffs still have a reasonable opportunity to obtain a formal opinion....

(Doc. 15 at 7–8).

**42.** ASB Defendants argue that this case is procedurally similar to *Digital,* in that the district court dismissed Digital's complaint for lack of subject matter jurisdiction, finding that Digital's "rush to the courthouse was premature" as Digital had failed to exhaust its available remedies at law. (Doc. 15 at 6). The ASB Defendants argue that like *Digital,* here, the Plaintiffs "in their haste to preserve their perceived First Amendment rights, rushed prematurely to the courthouse and as a result failed to present a mature claim for review." *Id.* at 7.

Further, the ASB Defendants argue that "[a]t a minimum, plaintiffs' [sic] have an obligation to obtain a conclusive and binding response from those who have the power and authority to establish the Bar's 'enforcement policy' prior to attempting to invoke the jurisdiction of this court." (Doc. 15 at 8) (citing *Digital,* 121 F.3d at 586). The ASB Defendants contend that the Plaintiffs failure:

> to diligently pursue their available state law remedies establish that no mature case or controversy exists. Because of the plaintiffs' haste, the claims ... are in the nature of a request for an advisory opinion, which clearly does not rise to the level of a case or controversy necessary to confer subject matter jurisdiction on this court.

*Id.*

rests with the party who invokes federal jurisdiction.[43] *Id.* (citing *Bennett v. Spear*, 520 U.S. 154, 167–68, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); and, *Valley Forge*, 454 U.S. at 472, 102 S.Ct. 752. Further, the ASB Defendants argue that "[t]he reasonableness of the plaintiffs' fear that the ASB Defendants will enforce the 'enforcement policy' against them is a determining factor in this regard." *Id.* This Court, as other courts noted in *Wilson* and *ACLU*, agrees with the Defendants on that narrow ground, and finds that the Plaintiffs maintain a reasonably and objective belief that the enforcement policies will be used against them if they act in contravention to the findings of the Advisory Opinions.

This Court finds the Defendants' contentions that the non-binding nature of their Advisory Opinions equals no "injury-in-fact," faulty at best. Common sense tells this Court that when an advisory body, in charge of governing the statewide conduct of the judiciary, issues some two-hundred (200) opinions over the past five (5) years directing specific individuals how to act and files charges *at least* once a year, judges or judicial candidates, acting with reason, would be cited as acting unethically if they proceeded to act inapposite to the findings, if such opinions were taken lightly or tossed aside simply because they are "non-binding." Additionally, as set forth by the U.S. Supreme Court, there does not have to be an actual charge brought before a plaintiff may assert a claim for a violation of free speech rights. Notably, here, the status of the Advisory Opinion as non-binding does not change the fact that the Plaintiffs will still reasonably and understandably fear disciplinary

action if they act in contravention to the provided "advice." After all, the role of the JIC and ASB is to provide guidance to the judiciary as to what constitutes proper ethical behavior to avoid acting in violation of the CANONS in a way that would perpetrate charges. Surely they would not wish to encourage a presumption to flout such determinations

Moreover, this Court finds that the assertion that the Plaintiffs lack standing and an injury-in-fact because they did not specifically request the advisory opinion at issue is not persuasive when viewed in light of the importance of avoiding a chilling effect of FIRST AMENDMENT rights. The Plaintiffs did not have to have a direct link to the Opinions because the Opinions' very nature is to govern the conduct of the entire judiciary and set a standard for the entire judiciary to follow, even if only prompted by the request of one individual. Additionally, as to the ASB Defendant's argument that the time of issuance of the opinion precludes injury-in-fact, that is not a persuasive factor here because even thought the ASB Opinion was issued after the deadline to respond to the CCA questionnaire, the Plaintiffs may have already engaged in self-censorship out of fear that the ASB would decide along similar lines as the JIC, and thus find responding a violation of the CANONS "as-applied" to the questionnaire.

Further, this Court finds that the ASB Defendants also argue, unpersuasively, that "[a]t a minimum, plaintiffs' [sic] have an obligation to obtain a conclusive and binding response from those who have the power and authority to establish the Bar's 'enforcement policy' prior to attempting to

---

**43.** The ASB Defendants also rely upon *Stretton v. Disciplinary Bd. Of the Supreme Court of Pennsylvania*, 944 F.2d 137 (3d Cir.1991), in which the Third Circuit vacated an injunction entered by the district court, striking down a provision of the Code of Judicial Conduct (for Pennsylvania) that is "virtually identical to the provision at issue." (Doc. 15 at 11–12). The ASB Defendants argue that, in light of *Stretton* [c]learly, Alabama has a compelling interest[,] as:

> [t]he canon on its face proscribes campaign speech on 'pending litigation' which has been interpreted as limiting campaign speech by judicial candidates on issues that are likely to come before the candidate if elected judge. This limiting language of the canon and the limiting interpretation meets constitutional standards. Therefore, the plaintiffs' claims are without merit.

*Id.* at 14 (referencing the rationale for deciding *Stretton* and *Buckley v. Illinois Judicial Inquiry Board*, 997 F.2d 224 (7th Cir.1993)).

invoke the jurisdiction of this court." *Id.* at 8 (citing *Digital*, 121 F.3d at 586). Plaintiffs were not required to seek such an opinion where they had already been instructed by a non-binding body (who would assumptively have a lower threshold status and easier hurdle for Plaintiffs to overcome) that responding violated the CANONS. Thus, it is not reasonable to contend that the Plaintiffs would have been required to see if they could obtain a favorable binding opinion from an entity who has a much higher standard of determination. Indeed, this argument dismisses the fact that, in the Plaintiffs' (and most likely other judges and candidates') reasonable perception of the Advisory Opinions, it would be believed that an authoritative body has already spoken and although the findings are not technically "binding," it simply is a matter of common sense to arrive at the conclusion that a judge or judicial candidate should not act in contravention to the finding of such an entity which was established to determine what comprises proper conduct in the judiciary.

As such, this Court agrees with Plaintiffs' contentions that they have standing due to the "injuries-in-fact" created from the JIC and ASB's Advisory Opinions, as they constitute "[a] state action that chills First Amendment speech [which] is sufficient to create an actual injury, giving the injured party standing to bring suit." (Doc. 30 at 1). Under the less stringent standard for FIRST AMENDMENT standing, the Plaintiffs do not have to expose themselves to actual enforcement or have a pending charge against them to challenge a law, as instead, "an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *See Wilson*, 132 F.3d at 1428; and, *Jacobs*, 50 F.3d at 904. Plaintiffs have established that they face an actual and imminent injury as they have already engaged in self-censorship and they reasonably fear disciplinary action if they act in contravention to the Advisory Opinions.[44] Here, this Court finds that the Plaintiffs have demonstrated such a circumstance in that they have been chilled from exercising their rights to free speech, for purposes of finding standing, as they have had to forgo expression in the form of self-censorship and in order to avoid future disciplinary action. Notably, the Plaintiffs injury, as to their FIRST AMENDMENT rights to free speech being chilled, constitutes self-censorship which is "a harm that can be realized even without an actual prosecution[,]" in addition to the fear of prosecution. (Doc. 22 at 2) (citing *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988), *cert. question answered by* 236 Va. 168, 372 S.E.2d 618; and, *Wilson*, 132 F.3d at 1428). Although this may or may not be sufficient to make a determination as to the merits of this claim at some later date if needed, this Court finds that for the present purposes, it provides sufficient standing in that the Plaintiffs apparently find themselves "between the Scylla of intentionally flouting [a stated ethical rule] and the Charybdis of forgoing what [they] believe to be constitutionally protected activity in order to avoid becoming enmeshed in [presumptively unethical behavior]."[45] *See Kemler*, 108 F.Supp.2d at 536.

***

**44.** Plaintiffs contend that they "have all engaged in self-censorship based on JIC's and ASB's interpretation of Alabama Canons of Judicial Ethics and Rules of Professional Responsibility." *Id.* The Plaintiffs state that the candidates "are unable to express their personal and judicial philosophy or their personal views on legal and political issues[,]" and that "[t]he CCA must censor itself and not publish voter guides to inform the public about the judicial candidates because of the judicial candidates' self-censorship." *Id.* Plaintiffs argue that even though the likelihood of disciplinary action is an important factor to determine the reasonableness of the fear of enforcement, "a chill of First Amendment rights resulting in self-censorship is in itself the exact type of injury that gives standing to challenge a state action." *Id.* (citing *Virginia*, 484 U.S. at 393, 108 S.Ct. 636; *Wilson*, 132 F.3d at 1428, and, *ACLU*, 999 F.2d at 1492). This Court agrees.

**45.** Finally, this Court does not need to reach whether or not the Plaintiffs have adequately established that the state administrative struc-

### b. *Injury Traceable To Defendants' Action*

To find standing, the federal courts must also find that the Plaintiffs' injury is traceable to the Defendants' allegedly illegal actions. Here, the Plaintiffs [46] contend that "[a]s the result of the JIC's and ASB's direct action, the judicial candidates have been prohibited from expressing their personal views on legal and political matters of great importance to the voting public, and CCA cannot receive or publish this information from judicial candidates, both in violation of the First Amendment." (Doc. 1). Plaintiffs' argument that they have standing to make this FIRST AMENDMENT challenge because they have suffered the actual "injury-in-fact" of self censorship as well as a potential threatened injury-in-fact of disciplinary action, as a result of the putatively illegal conduct of the Defendant, is successful. (Doc. 30 at 5). Since the candidates have refused and will continue to refuse, to answer the questionnaire, the candidates personally suffer not only an actual but a threatened injury as well due to the Advisory Opinions in question. *See ACLU*, 999 F.2d at 1493; *Virginia*, 484 U.S. at 393, 108 S.Ct. 636 (concluding that plaintiffs alleged an actual and well-founded fear the law would be enforced against them and that the alleged danger of this statute is one of self-censorship—a harm that can be realized without an actual prosecution); and, *Ackerson v. Kentucky Judicial Retirement and Removal Comm'n*, 776 F.Supp. 309, 312 (W.D.Ky.1991) (finding that "a real possibility exists that sanctions will be sought" and so gave rise to an injury even though

the judicial candidate had not yet been charged with an ethical violation).

The Defendants assert regarding Plaintiffs' claims of self-censorship and fear of disciplinary action, that any such injury, rather than being traceable to the Advisory Opinions, is more fairly traceable to CCA strategy decisions, suggesting that the CCA made a political complaint about the conduct of the Committee and declined to work with them to develop an acceptable questionnaire and that when the committee declined to approve it this year, the CCA "opted to send it out as written ... directing candidates to respond," and has possibly timed this litigation to create the injuries asserted by the Plaintiffs. (Doc. 18 at 10–12). Additionally, the Defendants contend that the Plaintiffs have failed to demonstrate the likelihood of disciplinary action was "so great as to constitute an imminent threat of prosecution[,]" and that "[t]he very nature of the advisory opinion undermines Plaintiffs argument." *Id.* at 10. Specifically, the JIC Defendants note that advisory opinions are not binding and do not affect a party's rights or remedies in that while the JIC can by majority vote, decide to bring charges for ethical violations, it has no authority to impose sanctions. *Id.* The JIC Defendants argue that "[t]he advisory opinion is just that: an opinion made in response to a specific inquiry meant to provide some guidance[,]" and that "[t]he opinion is *not* a warning that if certain action is taken charges will be brought." *Id.* As such, the Defendants claim that the Plaintiffs have not adequately established that the state administrative

---

ture which they seek to enjoin compels them to do, or to refrain from doing, anything; instead, it is the combination of the findings of the advisory opinions coupled with a credible threat of potential prosecutorial disciplinary action, viewed in light of the relaxed standard for FIRST AMENDMENT standing, which provides this Court with grounds for subject matter jurisdiction.

**46.** Additionally, Judge Crawley argues that the JIC's interpretation of the CCA questions is an "overbroad, unconstitutional regulation of protected political speech under the First

Amendment[,]" and that because the Advisory Opinion constitutes an official policy of the State of Alabama, the policy must be enjoined as it violates the federal constitution. (Doc. 11 at 18–25). Judge Crawley thus requests this Court declare the "enforcement policy" unconstitutional "as-applied" as a violation of free speech and, declare that judicial candidates answering questions 4–5, 13, 16–24, 26, and 29–30 of the CCA's survey are protected from regulation in order to prohibit the Defendants from enforcing the opinion and from filing complaints based upon it for CANONS violations. (Doc. 11 at 8–10)

structure which they seek to enjoin compels them to do, or to refrain from doing, anything. Accordingly, the Defendants assert that the Plaintiffs' argument "depends on too many contingencies" as "[w]hen and if the Commission decides by majority vote to bring a charge before the Court of the Judiciary, there will be a hearing on the charge before that body, a violation may or may not be found, sanctions may or may not be imposed." [47] *Id.* Further, the ASB Defendants argue that the Plaintiffs alleged injury "cannot be fairly traced to the challenged conduct because the informal, non-binding advisory opinion was not issued to the named plaintiffs and because the opinion was not issued until **after** the CCA's submission deadline[,]" so that "[i]t is illogical to contend that any actual or threatened injury can be traced to this opinion." (Doc. 15). Thus, both Defendants argue that the Plaintiffs have failed to demonstrate the alleged injury is "fairly traceable to the challenged action of the defendant[,]" as "[t]o say that issuance of a non-binding advisory opinion in and of itself causes a chilling effect is to make too big of a leap." (Doc. 18 at 11).

This Court takes note of the Defendants' arguments but finds, however, that if the JIC and ASB had not adopted the "enforcement policies," as set forth in their respective Advisory Opinions, the candidates would have no need to refuse to answer the questions and would not fear charges for ethical violations, and essentially would not be before this Court presently. (Doc. 30 at 6). Although this "traceable" requirement may initially create a high hurdle for Plaintiffs, here, the Plaintiffs reach this bar. Indeed, the "injury-in-fact" of both self-censorship in being unable to answer and receive and publish the CCA questionnaire, in addition to the credible threat of disciplinary action, is directly traceable to the JIC's and ASB's Advisory Opinions for the simple clear fact

that Plaintiffs would not be asking for this relief if they did not fear prosecution for acting in contravention to the Advisory Opinions. *See e.g. Kemler,* 108 F.Supp.2d at 539. Thus, although the Defendants' claims may at the outset of analysis complicate the Plaintiffs' causation analysis for "injury-in-fact," this Court does not need to reach that step, as the initial self-censorship resulting from the issuance of the Advisory Opinions provides adequate and solid grounds upon which to find an "injury-in-fact." *Id.* As such, the Defendants' actions are indeed traceable to the Plaintiffs' injuries.

#### c. *Redressable Injury*

To find standing for the Plaintiffs in this matter, this Court must determine that the Plaintiffs have a redressable injury. As to this element, the Plaintiffs contend that their "injury-in-fact" is indeed redressable by a favorable decision because the Advisory Opinions in question, which dictate proper conduct to the judiciary, establish an unconstitutional "as-applied" interpretation of the Canons. Additionally, the Plaintiffs contend that the Advisory Opinions, although technically non-binding, set the standard for proper ethical conduct in the judiciary, so that to act in direct contravention to the state agencies' findings would surely engender disciplinary action.

In contrast, the Defendants argue that the Plaintiffs have failed to demonstrate with respect to their alleged injury that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. The Defendants, in support of this claim for an attenuated possibility of enforcement, assert that their respective Advisory Opinions do not represent the law applicable to any judicial candidate in answering the questionnaire in that they are non-binding and are merely what they claim—informal and advisory. Indeed, the Defendants refer to

---

**47.** As such, the JIC Defendants claim that "it cannot be said that Plaintiffs are threatened with imminent enforcement of the advisory opinion[,]" as "Plaintiffs 'allegations of harm or injury are much too attenuated to meet the

requirements of standing.'" *Id.* (citing *Kemler,* 108 F.Supp.2d at 538; and, *Florida Ass'n of Medical Equipment Dealers, Med–Health Care v. Apfel,* 194 F.3d 1227, 1230 (11th Cir. 1999)).

the CANONS which are always in force, arguing that the law is represented by the CANONS, which Plaintiffs have not challenged, rather that in their Advisory Opinions, so that regardless of the "enforcement policies" of these Opinions, the Plaintiffs would still be under the same legal requirements with respect to responding to the questionnaire.[48] (Doc. 18). Thus, the Defendants generally contend that the injuries asserted by the Plaintiffs would be better redressed by a direct challenge to the CANONS, through an allegation that is unconstitutional on its face or as applied. (Doc. 18 at 12).

Here, this Court finds that the Plaintiffs' free speech rights have been chilled through self-censorship in that even though the conclusion that the Plaintiffs would be disciplined may be attenuated, as it relies upon some contingencies; however, the fact that the Plaintiffs have already had to restrict their speech through self-censorship, in not responding to, or receiving and publishing, the CCA questionnaire provides a possible redressable injury. The record reveals governmental restriction of speech that is regulatory in that the JIC and ASB regulate the conduct of judges in the State of Alabama, and, the prospect of actual enforcement of the Advisory Opinions, albeit unknown at this time, is not so attenuated by intervening contingencies that the "injury-in-fact" requirement necessary to support standing cannot be satisfied, especially in light of the extant "injury-in-fact" of self-censorship.

## C. *PRELIMINARY INJUNCTION*

### 1. *Federal Standard For Preliminary Injunction*

■■ The "grant or denial of a preliminary injunction is a decision within the sound discretion of the district court." *See Sierra Club v. Georgia Power Co.,* 180 F.3d 1309, 1310 (11th Cir.1999); *United States v. Lambert,* 695 F.2d 536, 539 (11th Cir.1983). Federal courts have interpreted several common law substantive requirements to apply when making a preliminary injunction determination. At the outset, to grant such an injunction, the court does not need to find the evidence "positively guarantees a final verdict in plaintiff's favor[,]" rather, the Eleventh Circuit provides that a preliminary injunction will issue when the movant shows: 1) substantial threat of irreparable injury if an injunction does not issue; 2) proof that the threatened injury to movant outweighs the potential harm caused to the non movant; 3) the injunction would not disserve public interests; and, 4) a substantial likelihood of success on the merits. *See Tefel v. Reno,* 180 F.3d 1286 (11th Cir.1999), *reh'g and suggestion for reh'g en banc denied by* 198 F.3d 265 and *cert. denied by* — U.S. —,° 120 S.Ct. 2657, 147 L.Ed.2d 272; *Northeastern Florida,* 896 F.2d at 1284; *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 985 (11th Cir.1995); *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998); *Cunningham v. Adams,* 808 F.2d 815, 819 (11th Cir.1987); and *Canal Auth. of the State of Florida. v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974). Indeed, the federal court "must exercise its discretion in light of the[se] four prerequisites for extraordinary relief of a preliminary injunction." *See Nnadi v. Richter,* 976 F.2d 682, 690 (11th Cir.1992). As such, this Court is guided by the Eleventh Circuit's preliminary injunction standard and finds as follows.

---

**48.** The ASB Defendants also assert that even if this Court did render a favorable decision to the CCA, "it is unlikely such a decision will redress their claim, as CCA does not have a First Amendment right to receive responses to the questionnaire." (Doc. 15). The ASB Defendants claim that to conclude that the 'enforcement policy' is the cause of the judicial candidate's failure to respond to the CCA questionnaire "requires a great deal of speculation and conjecture and carries the plaintiffs' claim beyond the realm of concreteness required to invoke the jurisdiction of the federal courts[,]" as under the circumstances, the named Plaintiffs lack standing. *Id.*

## 2. Application

Pursuant to FED.R.CIV.P.RULE 65, Plaintiffs ask this Court to preliminarily enjoin the Defendants from enforcing their respective "enforcement policies," allegedly contained in the JIC and ASB Advisory Opinions at issue, by filing or considering disciplinary complaints based on these findings. The Defendants request that this Court deny injunctive relief because the Plaintiffs have failed to meet the standard for issuance of a preliminary injunction.

### a. Irreparable Harm[49]

In establishing irreparable harm,[50] the Plaintiffs argue that the enforcement policy constitutes an unconstitutional infringement on Plaintiffs' FIRST AMENDMENT rights of speech and association, as "Plaintiffs are suffering the loss of First Amendment freedoms which, for even minimal periods of time, constitutes irreparable harm." (Doc. 1 ¶ 5). Plaintiffs assert the balance of hardships "tips in the movants' favor because of the core political speech at issue and the lack of a narrowly tailored

means of accomplishing a compelling government interest in regulating the same."[51] Id. ¶ 6.

The Plaintiffs argue that as long as the "enforcement policies" of the JIC and ASB Advisory Opinions remain in place, the Plaintiffs will suffer irreparable injury as neither the judicial candidates not the CCA will be able to engage in their protected speech, due to a fear of enforcement of the state "policy" against them. (Compl. ¶ 2). Plaintiffs emphasize that the general election in November is "fast approaching[,]" but that as a result of the Advisory Opinions, several judicial candidates have refused to answer the CCA questionnaire although they would like to, so that they may inform the voters about their views.[52] Id. at 3–4. In contrast, the Defendants argue that there is no irreparable injury to either the judicial candidates or the CCA, contending that the CCA "is responsible for placing itself in its present position"[53] and, the possibility of disciplinary action resulting from their Ad-

---

**49.** The detailed arguments establishing grounds for making an irreparable harm determination were also expounded in this Court's similar assessment of "injury-in-fact" for standing. See infra III.B.

**50.** An injury is irreparable if it cannot be undone through monetary remedies. See Spiegel v. City of Houston, 636 F.2d 997 (5th Cir.1981), reh'g denied by 641 F.2d 879 (1981); and, Ferrero v. Associated Materials Inc., 923 F.2d 1441, 1449 (11th Cir.1991).

**51.** Plaintiffs state they would like to engage in their constitutional right of free speech to comment on legal and political matters of import to the voters, and that Plaintiff CCA would like to receive the speech prohibited by the enforcement policy before the November 2000 general election in order to publish certain responses by the judicial candidates.

**52.** Plaintiffs note that other judicial candidates answered the questionnaire, but have since requested the CCA not publish the answers due to a fear of charges being brought against them for Canons violations. (Compl. at 3–4).

**53.** The JIC Defendants assert that in 1998, the CCA contacted the Judicial Oversight Committee and suggested that a CCA question-

naire proposed at that time, might violate the CANONS, and that at the request of the CCA, the Committee reviewed it and agreed it would be impermissible and offered to cooperate with the CCA to develop an acceptable one. (Doc. 18 at 16–17). The JIC Defendants note that "[s]ince that time the CCOA has had many opportunities to contact the ... Committee and to develop a dialogue which would lead to an acceptable questionnaire[;]" however, the CCA "has not taken those opportunities." Id. at 17. The JIC Defendants thus argue that:

> [r]ather than distributing it in a time and way in which all parties could take sufficient time to thoroughly consider, and perhaps provide positive feedback on, the questionnaire, the CCOA elected to wait until August 30 to mail the questionnaire to judicial candidates. They then insisted that the candidates respond ... no later than September 10. Their strategy in this regard is unknown, but certainly raises a significant suspicion that it was directly calculated to create the sense of urgency and alarm which the CCOA now claims.

Id.

visory Opinions depends upon "various contingencies." (Doc. 18).

Specifically, citing *Buckley,* 424 U.S. at 14, 52–53, 96 S.Ct. 612, *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), and, *Buckley v. Illinois,* 997 F.2d at 231, the Plaintiffs contend that judicial candidates should have the unfettered opportunity to make their views known, as "[w]hile it is true that 'the principle of impartial justice under law is strong enough to entitle government to restrict the freedom of speech of participants in the judicial process, [it is] not so strong as to place that process completely outside the scope of the constitutional guaranty of freedom of speech.'" (Compl. at 8). Plaintiffs argue that if the government decides to restrict free speech rights of judicial candidates and the CCA, it must do so in a way that recognizes the candidates' right to campaign speech, the CCA's right to receive and publish such speech, and the concomitant right of the public to be informed. *Id.* at 9 (citing *ACLU,* 744 F.Supp. at 1097).

■■■ Moreover, the Plaintiffs assert that the judicial candidates and the CCA have already been irreparably harmed through self-censorship, in that they are prohibited from expressing and publishing their views on matters of public concern and will continue to be harmed, because they must say nothing about their views unless they wish to face ethical charges. (Compl. at 13). To meet the standard for finding an irreparable injury, the Plaintiffs must show that an irreparable harm or injury will be suffered unless the injunction issues. Here, this Court must keep in mind the special nature of this case and the understanding that "[i]t is well settled that the loss of First Amendment freedoms *for even minimal periods of time*

constitutes irreparable injury justifying the grant of a preliminary injunction." See Cate, 707 F.2d at 1188; and, *Elrod,* 427 U.S. at 373, 96 S.Ct. 2673 (1976)) (emphasis added). It has also been noted that "direct penalization ... of First Amendment rights constitutes irreparable injury" for granting preliminary injunctions. *Id.* "In short, irreparable harm is not difficult to establish when the impairment of First Amendment rights is at issue." *See Butler v. Alabama Judicial Inquiry Comm'n,* 111 F.Supp.2d 1241, 1249 (D.Ala.2000). This Court agrees and finds that due to the special nature of this claim, the rights it invokes, and the time frame involved, the Court must find irreparable injury as the Plaintiffs' free speech rights, albeit through self-censorship, have been restricted since the issuance of the JIC and ASB Advisory Opinions.[54]

This Court finds that the Plaintiffs have adequately established that they have sustained and may continue to sustain irreparable injury unless the Defendants are enjoined from enforcing the Advisory Opinions. This Court is guided by the U.S. Supreme Court's determination that any loss of FIRST AMENDMENT freedoms— even for minimal periods of time—can constitute irreparable injury. *See Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); and, *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). The Eleventh Circuit has similarly held that on-going violations of the FIRST AMENDMENT constitute irreparable injury because chilled free speech, due to its intangible nature, cannot be redressed through monetary damages. *See Cheffer,* 6 F.3d 705; and, *Cate v. Oldham,* 707 F.2d 1176, 1189 (11th Cir.1983).

**54.** Notably, here, the Plaintiffs were prohibited from filling out and sending in the CCA questionnaire, pursuant to JIC and ASB Advisory Opinions stating that to do so would be a violation of the ALABAMA CANONS. Although there has been no direct punishment at this time against Plaintiffs, the Plaintiffs contend that the Advisory Opinions creates a chilling effect on judicial issues and is unconstitutional because it penalizes the FIRST AMENDMENT rights of the judicial candidates and thus constitutes irreparable injury. As such, this Court, without reaching the merits of that contention, finds that for purposes of granting a preliminary injunction, the Plaintiffs have suffered irreparable harm.

Here, the Plaintiffs are not only subject to self-censorship, but additionally risk disciplinary action for what might later be deemed entirely ethical conduct. The irreparable harm caused by the restraint placed upon the Plaintiff's FIRST AMENDMENT freedoms cannot be remedied by an award of monetary damages, as the Plaintiffs have already engaged in self-censorship and fear another injury in the form of disciplinary action. Therefore, irreparable injury must be assumed in this FIRST AMENDMENT context.

### b. *Balance of Harm*

In determining the propriety of a preliminary injunction, federal courts must balance the prospective harm to the respective parties. Plaintiffs contend that the harm to them in not being able to exercise their free speech rights outweighs the harm to the Defendants, as the Plaintiffs have suffered and will continue to suffer, irreparable harm and can do nothing, while the Defendants may continue to prohibit comment by candidates by enforcing the CANONS and the RULES. (Compl. at 14). Plaintiffs argue that "this broad prohibition on free speech is an irreparable harm to Plaintiffs, substantially outweighing the harm a ... Preliminary Injunction would cause Defendants." *Id.*

In addressing the balance of harm as to the concerned parties, the Plaintiffs must show that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party. *See Butler,* 111 F.Supp.2d at 1250. Here, if this Court grants the motion for preliminary injunction, the only harm that would seem to accrue to the Defendants would be a delay in their ability to prosecute and seek sanctions against the Plaintiffs, if they intend to do so, in the Court of the Judiciary. This Court finds, for the purposes of a preliminary injunction, that the loss of FIRST AMENDMENT freedoms allegedly suffered by the Plaintiffs constitutes an inordinate amount of harm to them as the November 7, 2000, election is near and the candidates wish to have the voters apprised of their positions

before said date. As such, this leads this Court to find that greater injury would be inflicted upon the Plaintiffs by the denial of the injunction than would be inflicted upon the Defendants in granting one.

Indeed, as federal courts frequently note any potential hardship to the parties in determining whether to grant a preliminary injunction, to ascertain the harm that deferring review will cause to see if it outweighs the benefits it will bring the agency and the court, this Court notes as follows. *See Kemler,* 108 F.Supp.2d at 542. Here, this Court is influenced by the hardship element, as to outweigh deferral, the postponement of judicial review "must impose a hardship on the [plaintiff] that is immediate, direct, and significant." *Id.* The Plaintiffs argue that their reluctance to fill out the CCA questionnaires in full or at all and the inability of the CCA to receive and/or publish the speech, results in self-censorship which stems from a fear of adverse consequences from the potential enforcement of JIC and ASB Advisory Opinions, constituting a hardship; and, further, that they will continue to suffer this hardship so long as this Court defers adjudication of the claims raised. Although this Court will not at this time reach the merits of this claim, this Court does find that due to the particular exceptional circumstances of this case, involving vital constitutional rights which a federal court has an obligation to protect and preserve coupled with an extremely short time frame in which to provide any remedy, a much greater hardship will result from deferring judicial review to the Plaintiffs, and that the significance of that hardship is heightened by the fact that the Plaintiffs could face disciplinary action, due to the Defendants' possible enforcement of the Advisory Opinions.

### c. *Public Interest*

In assessing whether or not a court should issue a preliminary injunction, the public interest in such an issuance is a factor for consideration. Plaintiffs claim that the public's interest will be greatly

served by the issuance of a preliminary injunction, as the public will be able to make informed choices among candidates for office, is valid.[55] *Id.* (citing *Buckley,* 424 U.S. at 14–15, 96 S.Ct. 612). In contrast, the Defendants contend that a preliminary injunction would cause serious harm to the public interests, the Defendants argue that "Plaintiffs have not, and cannot, bear the burden of this requirement." (Doc. 18 at 18). Moreover, the Defendants[56] argue that "the CCOA is swimming upstream" against the tide towards changing the system to remove political angles from judicial races, in that "[i]ts questionnaire encourages political posturing and pandering by judicial candidates and to force all candidates into strict ideological niches." *Id.* Specifically, the Defendants argue that "[w]hile the CCOA has argued for an [sic] free exchange of ideas, its questionnaire does not call for such exchange[;][r]ather, its questionnaire restricts the free exchange of ideas and forces candidates to place themselves in ideological categories drawn strictly according to the interests of the CCOA." *Id.* The Defendants also claim that "[t]he advisory opinion promotes a considerably more important principal, which is the dignity, independence and credibility of the judiciary." *Id.* As such, the Defendants claim that an injunction "would not only undermine the legitimate and compelling interests of the state, but it would also undermine the Commission's reasonable procedures and the confidence which citizens of this state would have in their judiciary." *Id.* at 18–19, 96 S.Ct. 612.

This Court finds that the public interest will not be disserved by a granting of a preliminary injunction. Notably, in making a proper preliminary injunction assessment through balancing the public's inter-

est against the Plaintiffs, the Plaintiffs must establish that if one is issued, the injunction would not be adverse to the public interests. *See Butler,* 111 F.Supp.2d at 1250. Here, for purposes of a preliminary injunction and without reaching the merits of this action, this Court finds that the public interest will not be adversely affected by the issuance of a preliminary injunction. Instead, "the public interest is well served when the application of potentially unconstitutional laws is enjoined and when duly elected officials are not hindered from performing their duties by such laws." *See Butler,* 111 F.Supp.2d at 1250. Indeed, "[t]his is especially true when, as here, the core principles of the First Amendment are at issue." *Id.*

### d. *Likelihood of Success on the Merits*

█ In order to preserve specific vital constitutional rights when emergency interim relief is at issue, it is not merely a matter of instantaneously waving the discretionary magic wand and hoping for a desired result. Instead, it is a matter of following the focused and steady hand of federal jurisprudence, which waves in a particular directed fashion, over the seemingly bottomless FIRST AMENDMENT hat, to thus pull out the appropriate and yet often proverbial preliminary injunction "rabbit." Thus, after much deliberation this Court finds that it does not need to render a determination as to the substantial likelihood of Plaintiffs' success on the merits. Specifically, there is no such necessity as even though this element is a vital one in preliminary injunction determinations, due to the material change in the nature of the CCA questionnaire,[57] coupled with the gravity of the injury-in-fact and irreparable injury to the Plain-

---

**55.** Plaintiffs argue the policy thwarts the Plaintiffs' interest in informing the public on legal and political issues of great public concern, particularly during election time, so that the public's interest would best be served by issuance of a preliminary injunction, enjoining the enforcement of the JIC and ASB policy. *Id.* at 15.

**56.** The ASB Defendants cite the same arguments.

**57.** In that the CCA has stricken half of its original questions upon which the JIC and ASB made its preliminary determination.

tiffs manifesting a need for immediate interim relief, this Court will refrain from addressing the merits as this case has been altered by the factual change stated and addressing the merits might inappropriately suggest a future finding at the state level. Thus, this Court will exercise its discretion very narrowly under the *Pullman* abstention doctrine and refrain from making a determination on the Plaintiffs' substantial likelihood of success on the merits at this time.

There is a "special duty of federal courts to vindicate federal rights, especially when the challenge is that a statute on its face is repugnant to the first amendment[;]" however, here, there has been no challenge to the CANONS on their face, as the Plaintiffs allege only an unconstitutional "as-applied" interpretation of the CANONS to the factually specific 30 question CCA questionnaire at issue. *See Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). The U.S. Supreme Court has held that "the abstention doctrine is inappropriate for cases in which the statute is justifiably attacked on its face for an 'overbreadth' that abridges free expression[;]" here, however, this is not the issue, as there has been no facial attack on the CANONS themselves and no "overbreadth" contentions. *Id.* at 396.

▆▆▆▆ Indeed, pursuant to *Pullman,* district courts have discretion to abstain when they are presented with both a federal constitutional issue and an unsettled issue of state law whose resolution might narrow or eliminate the federal constitutional question. Notably, the twin purposes of *Pullman* are to avoid "needless friction with state policies" and to avoid unnecessarily deciding federal constitutional questions. *See Pullman,* 312 U.S. at 500, 61 S.Ct. 643. Additionally, in determining whether this Court should exercise its discretion to abstain under *Pullman,* several preconditions must be met: 1) uncertain issues of state law underlying the federal constitutional claim must exist; 2) state law issues subject to state court interpretation that could obviate the need

to adjudicate or substantially narrow the scope of the federal constitutional claim must be present; and, 3) an erroneous construction of state law by the federal court would disrupt important state policies. *Id.;* and, *Fleet Bank, National Ass'n v. Burke,* 990 F.Supp. 50, 53 (D.Conn.1997) (finding that there must be an unclear state law issue, determination of the federal issue must depend upon the interpretation given to the ambiguous state issue, and the state law must be susceptible to an interpretation that would avoid or modify the federal constitutional issue). However, courts have observed that "abstention is reserved for 'very unusual or exceptional circumstances.'" *See Williams v. Lambert,* 46 F.3d 1275, 1281 (2d Cir.1995), *stay vacated by* 46 F.3d 1275, *on remand to* 902 F.Supp. 460 (S.D.N.Y.1995). As such, the finding for *Pullman* abstention is case-by-case dependent.

Moreover, in the context of FIRST AMENDMENT clams, *Pullman* abstention has generally been disfavored where state statutes have been subject to facial challenges and that even where abstention has been required despite a claim of facial invalidity, the plaintiffs were not challenging the application of state law to prohibit a specific example of allegedly protected expression. *See Dombrowski v. Pfister,* 380 U.S. 479, 489–90, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 307–312, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Indeed, "[i]f abstention is normally unwarranted where an allegedly overbroad state statute, challenged facially, will inhibit allegedly protected speech, it is even less appropriate ... where such speech has been specifically prohibited." *See Bad Frog Brewery v. New York State Liquor Auth.,* 134 F.3d 87, 94 (2d Cir.1998). Here, again, Alabama state statutes are not the subject of facial challenges.

In the instant case however, the facts reveal exceptional and special circumstances which suggest abstention is prop-

er, as the facts pose an important constitutional issue regarding the scope of the FIRST AMENDMENT right to free speech among judicial candidates and the CCA in the State of Alabama.[58] Even so, though proper grounds may exist for *Pullman,* it is still within the district court's discretion to determine whether the *Pullman* abstention doctrine is to be used. Indeed, *Pullman* is only applicable in "special circumstances," as abstention is to be invoked sparingly in actions involving alleged deprivations of FIRST AMENDMENT rights, even where the state law at issue has not been resolved by the state supreme court. *See Kusper v. Pontikes,* 414 U.S. 51, 55, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Zwickler,* 389 U.S. 241, 252, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); and, *Harman v. Forssenius,* 380 U.S. 528, 534, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965). Because the case at bar is a FIRST AMENDMENT claim coupled with an allegation of an immediate and ongoing irreparable injury, and considering the great costs which would be imposed by a complete abstention in this matter, this Court will only abstain as to the very narrow determination on the Plaintiffs' likelihood of success on the merits regarding the 15 remaining CCA questions, as the Plaintiffs' injuries are such as to require interim relief.

As such, here, there exist special circumstances, so that before this Court will even entertain the notion of reaching the merits of Plaintiffs' claims to show the "substantial likelihood" preliminary injunction element, the threshold issue of whether under the *Pullman* standards, abstention from deciding the claims asserted by the Plaintiffs in favor of a state court resolution of certain unsettled questions of state law, is proper, must first be addressed. This Court notes that *Pullman* abstention may be proper "[w]here resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law. . . ." *See Duke v. James,* 713 F.2d 1506, 1510 (11th Cir.1983). In *Duke,* the court noted that abstention is inappropriate only "when state law is clear." *See Duke,* 713 F.2d at 1510. Here, it is by no means clear that the JIC and ASB challenged Opinions and "enforcement policies" comport with the ALABAMA CANONS and/or the U.S. CONSTITUTION, which reveals an unsettled question of state constitutional law which may moot Plaintiffs' federal constitutional claims and presents a classic case for abstention.

The Plaintiffs argue in opposition to abstention on the grounds that the inevitable delay in obtaining a final resolution of their claims will result in irreparable harm to their FIRST AMENDMENT interests. This Court agrees that a total abstention here would be indeed inappropriate and inflict continued injury on the Plaintiffs; however, a partial and very narrow abstention is more appropriate. The U.S. Supreme Court has noted that *Pullman* abstention should be cautiously applied in FIRST AMENDMENT claims as:

> [t]hese principles [limiting abstention] have particular significance when, as in this case, the attack upon the statute on its face is for repugnancy to the First Amendment. In such case to force the

---

**58.** Notably, the Supreme Court of Alabama has never interpreted the FIRST AMENDMENT in light of the type of facts with which this Court is now confronted. It is unsettled, as a matter of state law, whether state officials who have been sued in their individual and official capacities for establishing alleged unconstitutional enforcement policies, may be acting in violation of the FIRST AMENDMENT when they interpret the Canons "as-applied" to specific facts. Moreover, due to the material change in the type and number of questions in the CCA survey (from 30 to 15), the JIC and ASB state entities overseeing the conduct of the judiciary, have not yet had the opportunity to provide a determination as to the remaining questions at the state level. Hence, this Court is confronted with facts presenting an important federal constitutional issue and an unsettled question of state law which, when answered, may make final resolution of the constitutional question unnecessary. Thus, the general considerations underlying the *Pullman* doctrine of abstention are therefore, applicable.

plaintiff who has commenced a federal action to suffer the delay of a state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect. *See Zwickler,* 389 U.S. at 252, 88 S.Ct. 391; and *Cate,* 707 F.2d at 1184.

Indeed, this Court notes that *Pullman* abstention is not always inappropriate where FIRST AMENDMENT rights are raised. As in *Harrison v. NAACP,* 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959), abstention was proper because the state statutes had not yet been interpreted by the state courts and were thus in the courts view fairly susceptible to constitutional construction.[59] Here, the constitutionality of JIC and ASB Advisory Opinions interpreting the CANONS "as-applied" to result in an "enforcement policy" has not yet been before any Alabama state agencies or state courts and the new CCA questionnaire with only fifteen (15) questions has not been before the state of Alabama's JIC and/or ASB.

■ As such, "in cases where abstention is otherwise indicated under the *Pullman* doctrine, but where plaintiffs will suffer irreparable harm if the challenged law is enforced while state law questions are litigated in state court, the district court retains the power to grant whatever interim relief is necessary to protect plaintiffs during the period of abstention." *See American Booksellers Ass'n Inc. v. Webb,* 590 F.Supp. 677, 685 (N.D.Ga.1984). Although there is no pending litigation in state court in this case, because state questions and state policies as interpreted by state entities are involved, the Plaintiffs' concerns that a delay entailed with complete abstention will result in a serious chilling effect on their exercise of free speech rights, can be adequately addressed by considering the propriety of interim relief so that the interests underlying *Pullman* abstention are protected, but concurrently, the principle that federal courts bear primary responsibility for the protection of federal rights will also be upheld. *Id.* at 685–86.

Notably, in addressing whether interim relief is appropriate in the form of a preliminary injunction here, "another factor [which is found to be persuasive and] unique to abstention cases [which] must be taken into account," *American Booksellers,* 590 F.Supp. at 686, in that "insofar as the decision to grant interim relief rests in part on a preliminary evaluation by the Court of the merits of plaintiffs' case, it may conflict to some extent with the abstention interests in avoiding unnecessary constitutional decision making and having state courts decide issues of state law." *Id.* As such:

> *a court considering interim relief in an abstention case should assiduously avoid any unnecessary comment on the merits of plaintiffs' claims, since any preliminary ruling on the merits 'might be perceived by the state court as an attempt to force it to decide state law questions in accordance with the federal court's intimations.'*

*Id.* (emphasis added).

As the *American Booksellers* court held as to abstention:

> *[t]he Court should look first to the comparative injuries of the parties. Where the balance of harms is tilted heavily in favor of plaintiffs, then the court may grant interim relief without determining the likelihood of plaintiffs' success on the merits, as long as plaintiffs have raised substantial questions presenting fair grounds for litigation.... Where, on the other hand, the balance of harms tips decidedly toward defendants, interim relief will be justified only if the*

---

59. Additionally, in *Babbitt,* 442 U.S. at 306–312, 99 S.Ct. 2301, the Supreme Court ordered a district court to abstain where certain provisions of a state statute challenged on FIRST AMENDMENT grounds were found to be susceptible to constitutional construction; the

court also recognized the possibility of granting interim relief against enforcement of the challenged statute in order to mitigate the impact of abstention on their pursuit of constitutionally protected activities.

court can be practically certain that plaintiffs will prevail on the merits, and plaintiffs also will suffer at least some significant harm in the absence of such relief.

*Id.* (Citing 11 CHARLES A. WRIGHT AND AR-THUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948 at 453–54 (1973 & Supp. 1984)).

 Here, the issuance of a preliminary injunction is proper as the "balance of harms is tilted heavily in favor of plaintiffs" in light of the irreparable injury and short time frame within which a state remedy might be provided, so that this Court "may grant interim relief without determining the likelihood of plaintiffs' success on the merits," because Plaintiffs have indeed "raised substantial questions presenting fair grounds for litigation." Specifically, this Court's review of the fifteen (15) question CCA survey questionnaire at issue readily reveals, through just three examples,[60] that the Plaintiffs have substantial constitutional questions presenting fair grounds for litigation against the JIC and ASB, as their respective Advisory Opinions interpretations of the CANONS "as-applied" to the entire questionnaire are arguably ·violative of the Plaintiffs' FIRST AMENDMENT rights. Indeed, the Court need only examine a few of the questions in the CCA questionnaire to determine whether there are fair grounds for litigation that the blanket prohibition in the JIC Advisory Opinion, against answering any of the questions, is too broad to survive FIRST AMENDMENT scrutiny.

For instance, question number five (5), dealing with whether the judicial candidate's faith or religion should play any role in his or her judicial decision, hardly seems to evoke the type of harm any of the CANONS are designed to protect against. A judge should be able to rely on his or her faith or religion in his or her profession

without it: 1) necessarily implicating an issue likely to come before them in his or her judicial capacity (CANONS 7B(1)(a), 7B(1)(c), and 3A(6); 2) showing disrespect for, or an indication of an unwillingness to comply with, the law (CANON 2A); or, 3) indicating that the judge would somehow not be impartial or diligent in his or her duties (CANON 3 and CANON 7B(1)(c)).

Additionally, question number sixteen (16), which explicitly recognizes a judge's duty to strictly construe and enforce the acts of the legislature, asks the candidate whether, for moral or religious reasons, they are opposed to the establishment of gambling in this state for any reasons. Again, although the answer to this question (either agreeing or disagreeing) might, as the Advisory Opinion states, "tend to embroil the judicial candidate in political debate that is inappropriate to the dignity of judicial office" and therefore "places the judge in the role of a political advocate"[61] under CANON 2A and 3A(1), a reading of those two provisions leaves enough question as to whether they prohibit such a simplistic answer, that after a full hearing, in the appropriate state, on the merits of that interpretation, there is a substantial question presenting fair grounds for litigation.

Finally, as to question number twenty-six (26), the candidate is only asked whether they would have any philosophical objections to reducing an excessive verdict. Again, despite the JIC Advisory Opinion's finding that responses to such questions may give the impression that "the candidate would disregard controlling judicial authority [and] ... encourage disrespect,"[62] there appears to be nothing either implicit in the question that would suggest the candidate has a fixed legal opinion one way or another about the subject, or that they would or might not follow the law, if and when a situation might be

---

**60.** Because this Court finds "fair grounds for litigation" in three (3) of the fifteen (15) questions, it is not necessary to reach any discussion as to the remaining twelve (12) questions, as the three addressed herein provide adequate support for Plaintiffs' claims. ·

**61.** *See* JIC Ad.Op. 00–763 at 2.

**62.** *Id.*

presented to them as a judge. Indeed, a reading of CANON 7B(1)(c) does not suggest to this Court that responding to such a question, as the ASB Advisory Opinion holds, means the candidate has thus "announce[d] in advance [their] ... conclusions of law on issues [they] ... would be called upon to decide as a judge." [63]

As such, this Court finds that these three (3) brief examples demonstrate that the JIC Advisory Opinion's conclusion that the CANONS "do not permit" a candidate to respond to any of the CCA questions coupled with the ASB Advisory Opinion's conclusions that the CANONS dictate that "any response to such questions would constitute a direct violation," [64] when balanced against the candidate's FIRST AMENDMENT rights to free speech, demonstrate "fair grounds for litigation" as to the constitutionality of these "as-applied" interpretations.

### CONCLUSION

"Congress shall make no law ... abridging the freedom of speech." *See* U.S. CONST.AMEND. I. "A judge must avoid all impropriety and appearance of impropriety[,]" as because "[h]e must expect to be the subject of constant public scrutiny[,]"

it is noted that "[h]e must ... accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly." [65] Here, "we study the day before yesterday, in order that yesterday may not paralyze to-day, and to-day may not paralyze tomorrow." [66]

Accordingly, this Court finds [67] and it is hereby **ORDERED** that Defendants' motions to dismiss are due to be **DENIED;** Plaintiffs' Motion For Preliminary Injunction is due to be **GRANTED** on the aforementioned narrow grounds in that this Court **ABSTAINS** from making a determination on the merits of the Plaintiffs' claims and instead finds that Plaintiffs have raised substantial questions presenting fair grounds for litigation [68] and thus **ORDERS** that the above-styled Defendants, JIC named members and J. Anthony McLain (sued in his official capacity as ASB General Counsel), are hereby **ENJOINED** from the date of this Order, from enforcing or attempting to enforce the JIC and/or ASB Advisory Opinions, or ALABAMA CANONS OF JUDICIAL ETHICS, against the Plaintiffs, for responding to, and/or receiving and publishing the CCA fifteen (15) question survey questionnaire,[69] so·

63. *See* ASB Ad.Op. at 2.

64. *Id.*

65. ALABAMA CANONS OF JUDICIAL ETHICS, CANON 2A (Commentary).

66. *See* FREDERIC WILLIAM MAITLAND, SURVEY OF THE CENTURY, IN III THE COLLECTED PAPERS OF FREDERIC WILLIAM MAITLAND 439 (Cambridge: The University Press, 1911).

67. This Order and ruling, granting the preliminary injunction, is a very narrowly tailored determination which applies to the candidates for judicial office in the State of Alabama's November 7, 2000, general election.

68. Pursuant to *England v. Louisiana State Bd. Of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) and *Fields v. Sarasota Manatee Airport Auth.*, 953 F.2d 1299, 1304 (11th Cir.1992) (holding that a federal court litigant who is forced into state court under *Pullman* may reserve a right to return to federal court in that the plaintiff can preserve the right to the federal forum for federal claims by informing the state court of his or her intention to return following litigation of the state claims in the state court) and *Government and Civic Employees Organizing Comm., CIO v. Windsor*, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957) (holding that a federal district court should retain jurisdiction until all efforts to obtain adjudication on constitutional questions have been exhausted in the state courts), as this preliminary injunction grants interim relief to the Plaintiffs as of the date of this Order, the Plaintiffs may subsequently choose to proceed to the Alabama state courts or the relevant Alabama state agencies for a determination of their state constitutional claim as well as a construction of the challenged portions of the CANONS "as-applied" through the JIC and ASB Advisory Opinions, in light of their federal constitutional claims and the newly crafted fifteen (15) question CCA survey questionnaire.

69. This Order and ruling does not in any way apply to the fifteen (15) questions that were deleted from the original thirty (30) question CCA survey questionnaire.

that these Defendants are prohibited from commencing or conducting any investigations or initiating complaints concerning any state of Alabama judicial candidate for the November 2000 election, as well as from initiating proceedings regarding disciplinary procedures administered by the Alabama Disciplinary Commission against any such candidate.

Finally, all further proceedings in this matter are **STAYED**, and this Court **RETAINS** jurisdiction, not for the purposes of providing for a hearing on the merits, because granting this preliminary injunction, if there is compliance, should obviate the need for future proceedings, but to ensure that the parties comply with this narrow finding of this Order and do not act in violation of any of its directives, have the opportunity to pursue their available state remedies,[70] and for such other proceedings as may be necessary, depending upon state resolution of these issues.[71]

---

**70.** Moreover, although not on point to the case at bar as no disciplinary proceedings have commenced or are pending, this Court notes that the U.S. Supreme Court held in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), *on remand to* 687 F.2d 801 (3d Cir.1982), and as interpreted in *Butler v. Alabama Judicial Inquiry Comm'n*, 111 F.Supp.2d 1241, 1244–49 (M.D.Ala.2000), (holding that Justice Harold F. See, Jr., of the Alabama Supreme Court established a substantial likelihood of succeeding at trial on contentions that the CANONS, which formed the basis of judicial disciplinary proceedings against him, violated his

FIRST AMENDMENT rights, to warrant the issuance of a preliminary injunction and finding that *Younger* abstention was not proper), that "[a]bstention is based upon the theory that '[t]he accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection.' "

**71.** Pursuant to *Windsor*, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894, this Court will retain jurisdiction until all efforts to obtain adjudication on constitutional questions have been exhausted at the state level.